Roy P. **WINDHAM** et al., Plaintiffs,

v.

**AMERICAN BRANDS, INC.,** et al., Defendants.

C. A. No. 74-1008.

United States District Court, D. South Carolina, Florence Division.

Sept. 26, 1975.

642

E. N. Zeigler, Florence, S. C., for plaintiffs.

Norwood Robinson, Winston-Salem, N. C., E. LeRoy Nettles, Lake City, S. C., Ernest C. Pepples, Jr., Brown & Williamson Tobacco Corp. Law Dept., Louisville, Ky., for Brown & Williamson, Export Leaf Tobacco Co., and British American.

Hugh L. Willcox, Florence, S. C., for Philip Morris, Inc.

Douglas McKay, Jr., Columbia, S. C., Ira M. Millstein, Joseph W. Gelb, New York City, for Loews Theaters, Inc. d/b/a Lorillard.

C. Pinckney Roberts, John W. Thomas, Columbia, S. C., John O. Peters, Richmond, Va., for Universal Leaf Tobacco Co. and J. P. Taylor Co., Inc.

Henry B. Smythe, Charleston, S. C., Paul G. Pennoyer, Jr., New York City, for American Brands, Inc.

Joseph O. Rogers, Jr., Manning, S. C., William H. Hogeland, Jr., New York City, Murray H. Bring, G. Philip Nowak, Washington, D. C., for Liggett & Myers, Inc.

J. Means McFadden, Columbia, S. C., Robert B. Fiske, Jr., Bartlett H. McGuire, Mark L. Austrian, New York City, for R. J. Reynolds Tobacco Co.

C. Weston Houck, Florence, S. C., Z. Hardy Rose, Wilson, N. C., Fred D. Turnage, Washington, D. C., for Imperial Tobacco Co.

John L. Nettles, Florence, S. C., Larry D. Sharp, Howard Adler, Jr., Washington, D. C., for C. W. Walters Co. and Dibrell Brothers.

John K. Grisso, John C. Chernauskas, Edward Silverstein, U. S. Dept. of Agriculture, Washington, D. C., for Earl L. Butz, Sec. of Agr.

Richard E. Richards, Lancaster, S. C., N. R. Coleman, Jr., Greeneville, Tenn., for Austin Co., Inc. and Mullins Leaf Tobacco Co., Inc.

Tommy W. Jarrett, Goldsboro, N. C., D. Laurence McIntosh, Florence, S. C., for Gallaher, Ltd.

## ORDER

CHAPMAN, District Judge.

This matter is before the Court upon motion of plaintiffs seeking certification of this cause as a class action. Through extensive discovery, consisting mostly of depositions taken before the Court, together with briefs of counsel and oral arguments, the issue has been fully explored and the Court must now decide if the plaintiffs satisfy Rule 23 of the Federal Rules of Civil Procedure.

## PENDING MOTIONS AND BACKGROUND

The complaint sets forth three causes of action. It is alleged in the first and second causes of action that the company defendants, "with the knowledge, consent and acquiescence" of the Secretary of Agriculture (hereinafter referred to as Secretary) conspired to fix, control, lower and stabilize prices and

conspired or attempted to monopolize the warehouse auction markets for flue-cured tobacco in violation of §§ 1 and 2 of the Sherman Act. These actions by defendants allegedly occurred prior to July 15, 1974, the opening day of sales for the 1974 crop, and commenced as early as July 1970. This suit was filed July 29, 1975, and the first and second causes of action pertain to the four marketing seasons 1970 through 1973 and the first part of the 1974 season.

For a third cause of action plaintiffs allege that the company defendants and the Secretary unlawfully conspired "to fix, control and restrict . . . the amount of flue-cured tobacco which could be sold per day and per week in the auction warehouses available to plaintiffs . . . to apportion the available inspectors to various marketing areas, to restrain trade . . . , and to preclude plaintiffs . . . from selling their tobacco as it becomes ready . . . ." This conspiracy allegedly took place on or about December 14, 1973, therefore, only the 1974 season would be affected.

■ Plaintiffs have moved for leave of court to amend the third cause of action pursuant to Rule 15.[1] The proposed amendment covers alleged inequitable apportionment of inspectors between South Carolina and Georgia and states "no allegation of this complaint should be construed as an effort to amend, modify, or change the 'designation system' . . . ."

The company defendants assert that the motion to amend is not an effort to "clarify" the complaint, but rather an effort to change the basic nature of the third cause of action because discovery has revealed, as will be discussed more fully hereinafter, that many tobacco farmers support the "designation system". Defendants contend that grant-ing an amendment of this type would be improper and prejudicial at this stage of the case, since the evidence of farmer support of the "designation system" indicates that plaintiffs cannot properly represent the class.

The proposed amendment does not change completely the nature of the third cause of action. The new allegations tend to narrow the claim by alleging anti-trust violations in connection with the apportionment of available inspectors between the State of South Carolina and the State of Georgia. The defendants will not be prejudiced by allowing plaintiffs to amend. Any intra-class adversity that might effect plaintiffs' ability to adequately represent the class could be dealt with consistent with Rule 23, as is more fully discussed under the heading of "typicality". Therefore, plaintiffs' motion to amend is granted. The proposed third amendment attached to said motion, which has been served on all parties, shall govern the case consistent with further Order of this Court.

Also pending is the defendant Secretary's motion to dismiss pursuant to Rule 12, or, in the alternative, for summary judgment under Rule 56, on the following grounds: (1) The Court lacks jurisdiction with respect to the issues involved since plaintiffs seek, in effect, to bring an unconsented suit against the United States; (2) the complaint fails to state a claim upon which relief can be granted and (3) the Secretary cannot be in violation of the anti-trust laws for administering the flue-cured tobacco inspection and price support programs in accordance with their enabling statutes.

The Secretary cites *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) which involved an anti-trust attack on a California stabilization program for the raisin industry. The Su-

1. Rule 15(a) provides in part: "Otherwise a party may amend his pleading only by leave of court or by written consent of the ad-verse party; and leave shall be freely given when justice so requires."

preme Court held that the Sherman Act would not render the California Agricultural Prorate Act invalid, even, assuming the program would be invalid if made effective by a conspiracy of private persons.

"The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state." *Parker* at 351, 63 S.Ct. at 313.

The instant case is distinguishable. Plaintiffs allege the Secretary conspired with private persons in violation of the anti-trust laws, while Parker did not involve a combination of state and private action.

" . . . we have no question of the state or its municipality becoming a participant in a private agreement or combination by others for restraint of trade." (cite omitted). *Parker* at 351 and 352, 63 S.Ct. at 314.

The Secretary contends that the Court lacks jurisdiction of this case because plaintiffs have brought an unconsented suit against the United States. This is an area of the law that is not precisely defined.

"There is no general statutory jurisdiction over actions against federal officers and agencies. Such actions must find independent grounds for jurisdiction. The extent to which sovereign immunity may bar such a suit against an officer for actions done in his official capacity is an extraordinarily difficult question that the Court's decisions have failed to clarify." (footnotes omitted). C. A. Wright, Law of Federal Courts, at page 71 (1970).

The Secretary cites *Larson v. Domestic and Foreign Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) which involved a suit by an individual against the head of the War Assets Administration for an injunction prohibiting the sale or delivery of certain coal to anyone other than the plaintiff who felt that he had a contractual right to the coal. The Supreme Court held that sovereign immunity did apply.

"We hold that if the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign, whether or not they are tortious under general law, if they would be regarded as the actions of a private principal under the normal rules of agency. A Government officer is not thereby necessarily immunized from liability, if his action is such that a liability would be imposed by the general law of torts. But the action itself cannot be enjoined or directed, since it is also the action of the sovereign." *Larson* at 695, 69 S.Ct. at 1464.

■ The important prerequisite to finding sovereign immunity, as expressed above, is met when "the actions of an officer do not conflict with the terms of his valid statutory authority". The Court in *Larson* was aware that there may be suits for specific relief against officers of the sovereign which are not suits against the sovereign itself.

" . . . where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ultra vires* his authority and therefore may be made the object of specific relief. It is important to note that in such cases the relief can be granted, without impleading the sovereign, only because of the officer's lack of delegated power. A claim or error in the exercise of that power is therefore not sufficient. And, since the jurisdiction of the court to hear the case may depend, as

we have recently recognized, upon the decision which it ultimately reaches on the merits, it is necessary that the plaintiff set out in his complaint the statutory limitation on which he relies." (footnote omitted) *Larson* at 689 and 690, 69 S.Ct. at 1461.

 Clearly participation in an antitrust violation that is not in furtherance of a legislative command would be outside the scope of the Secretary's authority, therefore, the doctrine of sovereign immunity would not protect him.

Additionally, the Secretary asserts that the relief sought is in the nature of mandamus and would require that this Court order the Secretary to carry out the functions which are discretionary rather than ministerial and the complaint fails to state a claim upon which this Court can grant plaintiffs' requested relief.

 The relief sought against the Secretary is stated in general terms, to-wit, "for a mandatory order and/or injunction requiring the defendant, Secretary of Agriculture, to discharge the respective duties of his office . . ." The allocation of Government inspectors as between Georgia and South Carolina based on grower designation might well be the type of official function that this Court cannot properly control. But, if defendant Butz is found to have acted in excess of his authority, as alleged, restraint of his conduct would be proper injunctive relief from this Court. See *Larson, supra,* at 690, 69 S.Ct. 1457.

The Court concludes that the complaint states a claim upon which relief can be granted, the Court has jurisdiction to grant the relief sought and there are genuine issues of material fact; therefore, the Secretary's motion to dismiss and in the alternative for summary judgment are denied. The Secretary may renew his summary judgment motion at a later date and after the evidence is further developed if he be so advised.

The named plaintiffs have commenced this action for themselves and are requesting this Court to make them the representatives of all other South Carolinians who are "cooperators" or "producers" of flue-cured tobacco within the meaning of Title 7 of the United States Code § 1441[2] during the period 1970 through 1974. Based on the deposition testimony of Barney Page of the Agricultural Stabilization and Conservation Service it appears that there are no South Carolina producers of flue-cured tobacco who do not qualify as cooperators. The evidence reveals further that flue-cured tobacco grown in South Carolina is marketed as a result of participation of all four classes of producers, i. e. owners of land with tobacco allotments, lessees of allotments, sharecroppers and tenants. Many individual producers have the characteristics of more than one of these four classes of producers.

Flue-cured tobacco is sold by auction in individual piles at independent warehouses. In South Carolina there are presently 36 warehouses in 11 different geographic areas. Most South Carolina grown flue-cured tobacco is sold in South Carolina; however, large amounts

2. 7 U.S.C. § 1441 authorizes and directs the Secretary of Agriculture to make price supports available to "cooperators" for any crop of any basic agricultural commodity, which includes tobacco (see 7 U.S.C. § 1428(c)).

The terms "cooperator" and "producer" have been used interchangeably in this case. The statutory definitions indicate that cooperators are producers of a certain crop that qualifies for price supports.

"A 'cooperator' with respect to any basic agricultural commodity shall be a producer on whose farm the acreage planted to the commodity does not exceed the farm acreage allotment for the commodity under subchapter II of chapter 35 of this title . . . ." 7 U.S.C. § 1428(b).

7 C.F.R. § 719.2s defines 'producer' as follows: Person who as owner, landlord, tenant, or sharecropper, is entitled to share in the crops available for marketing from the farm or in the proceeds thereof . . . ."

have been sold in North Carolina, Georgia, Florida and Virginia. The grower designation system, which was effective for the 1974 season, removes price support from sales made more than 100 miles from the county seat of the county in which the particular farm is located, but it does not prohibit out-of-state sales.[3]

Plaintiffs' contend that defendants conspired to rig the bidding at tobacco markets and to hold down the price to the injury of every tobacco farmer in South Carolina. Plaintiffs claim further injury as a result of the alleged inequitable distribution of Government graders.

### RULE 23(a)

In order to qualify as a class action under Rule 23, the action must meet all of the requirements set out in Rule 23(a), which are: (1) the class is so numerous that joinder of all members is impractical, (2) there are questions of law and fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class and (4) the representative parties will fairly and adequately protect the interests of the class.

### RULE 23(a)(1)

### NUMEROSITY

■ There is no question that joinder of all members of the class would be impractical. The complaint estimates the class at 11,000, however, the Court feels that this is a very conservative estimate. Barney Page of the Agricultural Stabilization and Conservation Service testified for plaintiffs that in 1974 alone there were approximately 13,000 different farms in South Carolina on which tobacco was grown. Since a farm might have several tenants the number of cooperators might greatly exceed the number of tobacco farms. The fact that this suit covers a period in excess of four years must also be considered in estimating the numerosity of the class. Page estimated that there were approximately 30,000 names on the voter eligibility list of South Carolina tobacco farmers, tenants and operators during the relevant period. Plaintiffs own computer analyst, Richard C. Hoyt, estimated that the class, including lessees and sharecroppers, would total 20,000 to 25,000 persons. From these estimates, the Court concludes that it is reasonable to assume the purported class will number at least 20,000.

### RULE 23(a)(2)

### COMMON QUESTIONS OF LAW AND FACT

■ The existence of questions of law and fact common to the class is equally clear. The common questions of law and fact in this, and presumably in any other civil treble damage action, is

---

3. The so-called grower designation system was put into effect prior to the 1974 tobacco season by regulation adopted by the Secretary. 39 F.R. 17753 and § 1464.2(ii) provides in pertinent part as follows:

"(ii) Producer designation of warehouses. Producers will be required, as a condition of price support, to designate the warehouses at which they will market their tobacco. Such designations may be at any warehouse or warehouses in any market within a radius of 100 miles from the county seat of the county in which the farm is located . . . . A producer may obtain price support only in a warehouse he has designated, and at such warehouse only with respect to the quantity of tobacco he designated for sale at such warehouse."

As explained in this Court's decision in *Warr v. Butz*, 379 F.Supp. 268 (D.C.S.C.1974), the Secretary adopted the above regulation in order to alleviate the disorderly marketing that had been experienced previously. These prior problems stemmed largely from the fact that, during much of each buying season, the quantity of flue-cured tobacco ready for marketing far exceeded the quantity that could be graded by the number of government graders available or processed by the tobacco companies.

whether or not the defendants did or did not violate the anti-trust laws. Aside from deciding the existence of common questions under Rule 23(a)(2), the Court must decide whether these same questions predominate, which will be discussed under Rule 23(b)(3).

RULE 23(a)(3) and (4)

## TYPICALITY AND REPRESENTATION

In this case the prerequisites of Rule 23(a)(3) and (4) are closely related. The latter requirement has been interpreted by Judge Medina in *Eisen v. Carlisle and Jacquelin*, 391 F.2d 555 (2nd Cir. 1968) as follows:

"What are the ingredients that enable one to be termed 'an adequate representative of the class?' To be sure, an essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation. Additionally, it is necessary to eliminate so far as possible the likelihood that the litigants are involved as a collusive suit or that plaintiff has interests antagonistic to the remainder of the class." (391 F.2d at 562–63)

Defendants do not question the qualifications of plaintiffs' counsel to handle this type lawsuit. The Court recognizes that plaintiffs are represented by able counsel, familiar with anti-trust litigation and experienced in the field of agricultural litigation.

Being satisfied with the counsel aspect of representation, the Court turns to whether there are conflicting interests among the named plaintiffs and/or between the named plaintiffs and the class. This is basically the same question raised by the requirement of typicality.

"The second Rule 23(a)(3) requirement is that the representative claims be typical of the other members of the class. This has consistently been held to mean that his claim cannot be antagonistic to the claims of other members." (citations omitted). *Thomas v. Clarke*, 54 F.R.D. 245 (D.C.Minn. 1971).

Defendants contend that the named plaintiffs' deposition testimony and the third cause of action, as originally stated, reveal a position on grower designation of warehouses that is in direct conflict with the feeling of the vast majority of the South Carolina producers; and, consequently typicality does not exist, the named plaintiffs cannot adequately represent, and the purported class should not be certified, citing *Giordano v. Radio Corp. of America*, 183 F.2d 558, 560 (3rd Cir. 1950) and *Sullivan v. Winn-Dixie Greenville, Inc.*, 62 F.R.D. 370, 375 (D.C.S.C.1974) as follows:

"The interests of the representatives of the claim must be co-extensive with the interests of other members and groups within the class. There must be no possibility of any antagonistic interests since the allowance of a class representative with antagonistic interests to other members of the class would deny unnamed members of the class due process. (cite omitted)."

Defendants' witnesses confirmed that many South Carolina tobacco farmers favor the 1974 regulations relating to grower designation of warehouses. Also, South Carolina farm organizations, including the South Carolina Farm Bureau Committee, favor designation, which was upheld by this Court in *Warr v. Butz*, 379 F.Supp. 268 (D.C.S.C.1974).

It appears that at least some adversity among members of the purported class does exist. But as a practical matter, even if the motion to amend the third cause of action had not been granted, the existing adversity could be reconciled with Rule 23 without destroying the class entirely. While the opt-out provisions of Rule 23(c)(2) appear inap-

propriate to cure this problem,[4] it is clear that the designation issue could provide the theoretical basis for denying class action treatment to the third cause of action without denying class action treatment to the first two causes of action. Another alternative would be the use of sub-classes to separate the opposing views. The desired result in either case would be to eliminate antagonism so that the reasoning of *Giordano* and *Sullivan* would not apply.

The thrust of the lawsuit contained in the first and second causes of action alleges conspiracy to fix bids and force the sale of tobacco at prices lower than they would have been absent the conspiracy. The named representatives participate in the activity of growing tobacco in a variety of ways. On deposition each expressed dissatisfaction with the tie bidding and resulting price paid to him for his piles of tobacco. The anti-trust issues override the differences of opinion among members of the purported class on designation as a whole or the grader allocation procedures, therefore, class certification will not be denied on that ground.

Within the context of the first two causes of action, defendants assert that other antagonistic interests exist which are fatal to plaintiffs' attempt to maintain a class action.

The fact that some of the named plaintiffs feel they would benefit from a wider price spread between the best and worst quality tobacco and others assert that the current spread is too wide does not present a problem since the unanimous desire is obviously higher prices. However, there is one aspect of the price spreads that requires close attention.

The evidence indicates that the tie bidding occurred primarily on top quality tobacco, and that buyers who made substantial purchases of low quality tobacco have for that reason received, through allocation by the auctioneer, extra amounts of the higher quality tobacco which has been subject to tie bidding. It appears that the buyers in order to obtain more of the desirable tobacco which is subject to tie bidding, increased their bids on the lower quality tobacco. As a result defendants contend that farmers who produce low quality tobacco have interests antagonistic to plaintiffs producing higher quality tobacco, citing *Albertson's, Inc. v. Amalgamated Sugar Co., supra*. The Court finds the reasoning in *Albertson's* relevant and sound but supportive of plaintiffs' position on the question of typicality.

*Albertson's* involved an anti-trust class action by persons in a specified geographic area who purchased beet sugar from the two defendant manufacturers pursuant to a multiple base point pricing system, i.e. one where each purchaser paid the same price plus freight charges from a "base point", which was different from the defendant's refinery.[5] As a result the purchasers located near the base point paid the lowest delivered prices. The complaint alleged that defendants (1) engaged in a continuous combination and conspiracy in unreasonable restraint of interstate commerce and trade; (2) attempted to monopolize the market; (3) fostered an illegal tying agreement and (4) discriminated in price between purchasers. Class status was denied on the claims based on tying arrangements and price discrimination because the relief sought, enjoining all "objectionable" contracts, would effectively end base point-pricing. Since some of the class members were themselves competitors, the possibility

---

4. See *Free World Foreign Cars, Inc. v. Alfa Romeo*, S.P.A. 55 F.R.D. 26, 29 (S.D.N.Y. 1972) and *Albertson's, Inc. v. Amalgamated Sugar Co.*, 62 F.R.D. 43, 54 (D. Utah 2973), modified on other grounds, 503 F.2d 459 (10th Cir. 1974).

5. The reason was so defendants could compete in distant markets with cane sugar manufacturers.

of the elimination of base point pricing presents the basis of a clear conflict in interest among the class. However, the Court of Appeals for the 10th Circuit allowed the class action to proceed on the claims based on conspiracy and monopoly because any relief which might be granted would not necessarily put an end to the base point-pricing system.

■ While *Albertson's* raises a serious question for this Court, it cannot deny class status on the same grounds upon the evidence that has been presented. First, it is not clear to the Court that there are tobacco farmers who benefit from tie bidding on an overall basis. The tobacco farmer who sells low quality tobacco on one day may well sell average or superior quality the next day. If this is the case then the interest of the individual class members may not be antagonistic. Secondly, even if there are tobacco farmers who do benefit from tie bidding, it is pure speculation to state the relief sought by the named plaintiffs would eliminate tie bidding. Traditionally tobacco has been marketed by way of auction. If plaintiffs prevail and bid rigging and price fixing are enjoined, the auction system may or may not continue. Assuming that it does continue, there would be nothing intrinsically illegal about a tie bid, which becomes illegal only when it is the result of an unlawful conspiracy. Presumably, those who do benefit from tie bidding would continue to benefit.

The question of benefits to the seller of a poor pile of tobacco as a result of tie bidding raises other questions regarding predominance and manageability which will be hereinafter discussed.

### RULE 23(b)(3)

### PREDOMINANCE

In addition to meeting the above requirements of Rule 23(a), the action must also satisfy Rule 23(b)(3) which requires that once the prerequisites of Rule 23(a) are satisfied, the Court must find that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

■ Since common questions of law and fact do exist, the issue becomes whether or not they "predominate". Rule 23 does not define or make exactly clear what is meant by this term. What is clear, however, is that it is not sufficient that common questions merely exist, as is true for the purposes of Rule 23(a)(2), but the Court is under a duty to evaluate the relationship between the common and individual issues in all actions under Rule 23(b)(3). 7A *Wright and Miller, Federal Practice and Procedure,* § 1778, at page 52 (1972).

■ Class actions involving anti-trust issues are quite common [6] and plaintiffs feel that this case fits into the general mold, citing *Robertson v. N.B. A.,* 389 F.Supp. 867, 902 (S.D.N.Y. 1975):

"It has become almost axiomatic that allegations of conspiracy and violation of the Sherman Act satisfy the 'predominance' requirement of this subsection."

While anti-trust actions are often suited for class action the mere allegation that a conspiracy existed to violate the anti-trust laws does not insure that common questions will predominate. Rule 23 provides that the Court shall make various findings. A Court's conditional class action certification based on mere allegations would be an unwarranted avoidance of its duty to decide if those seeking the class have demonstrated that the requirements of the rule have been

6. The most frequently recurrent types of suits brought under (b)(3) are private triple-damage anti-trust suits, and actions based on various types of securities frauds. 3B *Moore's Federal Practice,* par. 23.45[2], pg. 23–758 (1974 edition).

substantially met. This is particularly true when the Court has had the opportunity to hear many days of deposition testimony and study the various exhibits introduced. See *In Re Hotel Telephone Charges*, 500 F.2d 86, 89 (9th Cir. 1974).

The *Robertson* action was brought by basketball players of the NBA, and involves issues on merger of the leagues, certain draft procedures and contract provisions. Plaintiffs sought money damages and injunctive and declaratory relief. The "commonality" and "predominance" requirements of Rule 23(b)(3) were not seriously disputed by defendants and the Court in *Robertson* stated that the class was not large enough to make administration of the suit difficult. (The class contained 365 present and past players, plus future players.) While meeting the requirements of Rule 23(b)(3), the Court decided that it would be more appropriate to proceed under Rule 23(b)(1), which does not specifically stress manageability. Clearly, the factual and legal questions in *Robertson* are quite different from the instant case which involves some 20,000 class members, who seek more than one-third billion dollars resulting from alleged price fixing and bid rigging in violation of the Sherman Anti-Trust Act. The Court feels that many of the other cases cited as supportive of the sweeping proposition quoted above are also distinguishable.

For example, *Siegel v. Chicken Delight, Inc.*, 271 F.Supp. 722 (N.D.Calif. 1967) is a case in which the District Court certified a class action involving alleged price-fixing by a franchisor, as well as alleged tying practices. However, a subsequent opinion of the Court of Appeals for the Ninth Circuit held that the price-fixing issue was not an appropriate subject for class action treatment, since its determination "would involve significantly different evidence and separate factual determinations as to each separate franchisee and that to impose such a burden in this case would be inconsistent with the basic salutory purpose of Rule 23." *Chicken Delight, Inc. v. Harris*, 412 F.2d 830, 831 (9th Cir. 1969).

The instant case is distinguishable in several aspects. First, *Chicken Delight's* class contained 650 members, compared with approximately 20,000 here. Second, the class action proceeded on a claim involving alleged tying practices which arose out of Chicken Delight's "standard forms of franchise agreements".[7] Finally, a major distinction is the fact that it became apparent to the Ninth Circuit that the 650 member class would overburden the court after the class had been certified and discovery had taken place. In the instant case class determination was not made initially, pending discovery on that very issue.

Discovery reveals that this case does not fit into the category of the "antitrust model" where all legal and factual issues relating to liability are uniformly relevant to all those allegedly harmed. See 3B *Moore's Federal Practice*, ¶ 23.45[2], pg. 23–759 (1974 edition).

Tobacco is a perishable commodity that is affected by many variables before it is placed on the auction floor for sale. Such variables include the suitability of the soil, weather conditions, skill of individual farmers, method of picking and method of curing. This combination of variables results in a leaf that may receive one of 161 different grades used by the Government inspectors in furtherance of its price support program. Graders determine the quality of a pile of tobacco based on such considerations as the body, color

7. If the franchise contracts varied and proof of tying would necessitate examination of individual franchisees' dealings, the class action may well have been denied altogether as in *Abercrombie v. Lum's, Inc.*, 345 F.Supp. 387 (S.D.Fla.1972).

and texture of the leaf, moisture content, sand and foreign matter content, degree of ripeness, spoilage and disease. The quality of tobacco varies from day to day and from pile to pile. A tobacco plant is cropped throughout the season from the bottom up. Generally, the lower leaves are of a poorer quality and are sold early in the season; however, some farmers may hold their tobacco longer than others in the hopes that the average price will rise.

Tobacco producers are a class made up of owners of land that has an allotment, lessees of allotments, sharecroppers and tenants. Many producers fit into a combination of these categories.

The non-standardization of product and producer indicates that the defendants may not have acted uniformly with respect to all of the class members. The extent to which this is the case bears directly on the requirements of Rule 23(b)(3).

Assuming plaintiffs can prove conduct by the defendants in violation of the anti-trust laws, they must also prove the fact of damage or injury resulting therefrom as an essential element of their case.[8]

"In any anti-trust action the issue of injury is a critical component of the determination as to liability and should not be confused with still another issue requiring individual analysis, i.e. calculation of the amount of damages." *Shumate & Co. v. National Association of Securities Dealers*, 17 F.Rep.Serv.2d 300, 301 (N.D.Tex. 1973), aff'd, 509 F.2d 147 (5th Cir. 1975).

As noted earlier, the evidence indicates that tie bidding occurred more frequently on sales of higher quality tobacco; and, in order to receive extra amounts of the better grades, defendants frequently increase their bid on lower quality tobacco. While this practice does not clearly create antagonistic interests among class members, it does create problems in proving injury or the fact of damage to those who sold poorer quality tobacco. The evidence necessary to prove liability as to sellers of poorer quality tobacco will necessarily differ from that required to prove a general conspiracy. And a realistic view of this case discloses that defendants will offer extensive proof in defense of the assertion of liability to producers of poorer quality tobacco. The fact that there are some 161 different government grades of tobacco will only serve to further complicate matters if the Court were to attempt to establish which grades were influenced by this allocation incentive.

The evidence also reveals complexities in proving the fact of damage because producers sell tobacco to different categories of purchasers. Some purchases plaintiffs concede give rise to no claim in this action. When the price of tobacco is lower than producers feel it should be, they often sell to the government sponsored stabilization program and receive the price support; and the plaintiffs do not seek damages on those sales. On occasion warehousemen purchase tobacco when they feel that prices are low in order to make their warehouse attractive to the individual producers. Plaintiffs do not seek damages for those sales. Also, a substantial amount of tobacco is sold to large buyers not named as defendants. Of course, these sales to non-defendants, warehousemen and stabilization constitute no injury to plaintiffs. But the purchasing practices of the non-defendant purchasers would be relevant, when compared to the purchasing practices of the defendants, in defense of the general conspiracy allegations.

In addition to the above it is reasonable to anticipate that defendants will

---

8. Whether or not common questions relating to the amount of damage predominate will be discussed later under this same heading.

introduce evidence of other individual dealings that are relevant to the defense of the issue of conspiracy. For example, it appears that (1) some of the nine defendants will be able to show that they did not buy on all or some of the eleven markets, which plaintiffs claim to have been subject to the alleged conspiracy; (2) the percentages of tobacco purchased by each defendant have varied from market to market, from warehouse to warehouse, from day to day and from year to year; and (3) identically graded tobacco is purchased at different prices at different times in different warehouses. All of this is relevant in defense of the plaintiffs' allegations of price fixing and attempts to monopolize the market by means of "percentage purchase agreements, parallel bidding, collusive bidding, and other acts."

Thus far in discussing predominance, the Court has mentioned evidence which defendants are likely to introduce, as well as evidence plaintiffs are likely to introduce. When dealing with products and purported class members that are not standardized, this appears to be a logical and realistic approach.

> "In determining whether common issues of law or fact predominate, the Court cannot ignore the issues of fact which are likely to arise in defense of the class actions, and the Court cannot assume that these defendants will waive the opportunity to attempt to discover and present evidence relating to their dealings with the individual class members." *In Re Transit Co. Tire Anti-Trust Litigation,* 1975 Trade Cases ¶ 60,144 at 65,417 (W. D.Mo.1975).

Some of the Court's observations are based on anticipated proof that undoubtedly will be relevant in the trial on the merits. The Court wishes to make it clear that its denial of class action status is not based on an opinion as to the validity of plaintiffs' claims. Some evidence relevant to the merits has been considered solely because the same evidence is relevant to the determination of the propriety of a class action.

In summary, even though there may be common questions of law and fact going to the issue of liability, the determination of the question of liability would involve a vast amount of evidence not related to the class as a whole and it would require factual determinations as to literally thousands of the purported class members. As a result, this Court is convinced that there is a serious question whether the common questions of fact and law are controlling.

Aside from the problems associated with establishment of liability and the fact of damage, plaintiffs will encounter additional problems in proving the amount of damage. Again the non-standardization of product and producers will necessitate individual attention which precludes the use of a workable formula in establishing the amount, if any, of each class member's damage.

> "Most class action certifications that have been permitted even though proof of damages may be a matter of individual proof appear to involve situations where establishing individual damages at least follows an easily ascertained standard pattern. The classic type of price-fixing case where it can be established that each unit sold was at an inflated fixed dollar amount per unit, and individual damages require only proof of the number of units purchased by each claimant, makes class action treatment appropriate. Where however, individual damages require extensive individual proof of local and varying market conditions to prove loss of profit, the task becomes enormously more complicated." *Bogosian v. Gulf Oil Corporation,* 62 F.R.D. 124, 138–39 (E.D.Pa. 1973).

Here, the complaint states that plaintiffs and others similarly situated should have received an additional ten cents per pound for the tobacco sold.

Discovery has revealed that some sales resulted in no claim of damages and, more importantly, the damages that may be established would not be the same, whether ten cents or any other figure, for each pound sold. Plaintiffs have offered no workable formula or method to aid in the computation and distribution of damages, and the Court knows of none. The only alternative to establishing damages on an individual basis would be to have the finder of fact establish damages based on generalized proof; however, such a method is in direct conflict with the requirements of Rule 23.

> "It has been suggested that generalized proof of damages might suffice under Rule 23. But the rule does not eliminate the ultimate need for individual proof of damages by each member of the class. Nor does it foreclose the right of each defendant to assert his defenses before a jury if one is requested. 28 U.S.C. § 2072 states in pertinent part: 'The Supreme Court shall have the power to prescribe by general rules, the forms of process . . . and the practice and procedure of the district courts and courts of appeals of the United States in civil actions. . . . Such rules shall not abridge, enlarge or modify any substantive right and shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution.' See *Colgrove v. Battin,* 413 U.S. 149, 161, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973); Class Action Symposium, 68 Nw.U.L.Rev. 991, 1049 (1974)." *Kline v. Coldwell, Banker and Co.,* 508 F.2d 226, 236 n. 8 (9th Cir. 1974) pet. for cert. filed Mar. 20, 1975, 43 U.S. L.W. 3517 (1975).

In briefs and oral argument, plaintiffs suggest that it would be helpful to try the issue of liability separate from the issue of damages which, it is further suggested, could be referred to a Master. While such a procedure would lessen the load on this Court, it would not result in overall judicial economy because the same individual determinations as to the amount of damages would have to be made. A split trial in this case would further frustrate Rule 23's objective of judicial economy because much of the evidence anticipated at the trial on liability would be duplicated at the trial on damages.

On the question of predominance, thorough discovery and careful consideration convinces this Court that this class action would, in effect, degenerate into innumerable individual lawsuits. Under these circumstances the Court concludes that the common questions of law and fact do not predominate over the individual questions. And as a matter of practicality the requirements of Rule 23(b)(3) cannot be met because the trial of this suit would be totally unmanageable.

### MANAGEABILITY

Defendants contend that the trial of this case as a class action would present formidable problems of management and class action status should be denied on that basis.

Often the literature and case law on Rule 23 refer to the finding of "manageability" as a separate requirement for a class action determination, but actually it is one of the non-exclusive factors which is to be taken into account in making the required findings of predominance and superiority under Rule 23(b)(3). It is discussed here under a separate heading so that the Court can focus on its crucial finding—that insurmountable difficulties will be encountered if this case is litigated as a class action.

Establishing the fact and amount of damage in this case would require thousands of individual determinations as noted previously. That, coupled

with the voluminous transaction data that must be dealt with convinces the Court that this action is unmanageable.

If this case were to be tried as a class action the parties would have to seek the warehouse receipts and other evidence pertaining to each sale, from all of the purported class members for the five seasons beginning in 1970. The documents pertaining to each individual sale would have to be analyzed to determine the seller, the purchaser, the grade and quantity of tobacco sold, and the price paid. Testimony on most, if not all, of the transactions can be anticipated in an effort to establish the fact and amount of damages; because many sales would not result in any damages, and the amount of damages proved would vary from sale to sale.

The evidence shows that there are a variety of relationships among producers themselves that relate to the question of manageability. For example, plaintiffs Windham and Nexsen lease tobacco allotments from others in turn they divide the revenue from tobacco farming with their own tenants. Thus there are various levels and kinds of economic interests connected with a single allotment. Assuming liability were established, distributing the amount of damage would be a very complex process. Many individuals who appear to be producers, as that term has been defined, may have suffered no damage. An example would be the owner of an allotment, who cash rents the allotment before the growing season begins. Another foreseeable difficulty, assuming liability is proven, is establishing the percent of interest of the producers who have partial interests in single allotment as described above. The fact that many of these agreements were entered into four and five years ago, and the probable informality of many of them, further complicates this process.

Regarding manageability plaintiffs stress the small geographical area in South Carolina encompassing the to-

bacco producers and the auction markets and the relatively small number in the purported class. These are relevant considerations regarding notification and feasibility of subpoena, and the Court agrees that they, alone, would pose no serious obstacle in some class action anti-trust cases. But the Court does not agree with plaintiffs' assertion that "manageability of the class is so apparent as to make the discussion almost academic." Insurmountable complexities can arise in spite of the relative smallness of the geographical area. The Court can envision the possibility of being required to consider or even make a finding on every pile of tobacco sold in South Carolina for the four years.

A purported class of 18,000 new car purchasers in the greater Kansas City area was denied class action status in *Ralston v. Volkswagenwerk, A.G.,* 61 F. R.D. 427 (W.D.Mo.1973), because, inter alia, individual questions as to the fact and amount of damages would make the action unmanageable:

"If damages were to be awarded in this action, they should not be based on speculation or a system of averaging. Rather, the compensation due each individual member of the class must necessarily reflect the damages actually suffered by that party. . . . A recognition that each member of the class would have a right to come into court and give evidence raises staggering problems of logistics. Manageability could not be assured, or even predicted. To afford manageability by impinging upon substantial rights—or duties—to present individualized evidence is not an acceptable goal of a class action." 61 F.R.D. at 432 and 433.

Similarly, "the complexity of the individual proof of damages" was one of the reasons why the Court *In Re Transit Co. Tire Anti-Trust Litigation, supra,* determined that it was totally unmanageable with only 750 class members.

Plaintiffs assert that a comparative analysis by the Court will prove their contention that this class action is manageable, citing *West Virginia v. Charles Pfizer & Co.*, 314 F.Supp. 710 (S.D.N.Y.1970), aff'd, 440 F.2d 1079 (2nd Cir.) cert. den'd, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971) (settled cases); *In Re Coordinated Pretrial Proceedings in Antibiotic Anti-Trust Actions,* 333 F.Supp. 278 and 333 F.Supp. 285 (S.D.N.Y.1971); and, especially, *Eisen v. Carlisle and Jacquelin,* 52 F.R.D. 253 (S.D.N.Y.1971).

An analysis of these cases reveals that the plaintiffs' contention over simplifies the factors to be considered in deciding the question of manageability. While class actions with more class members living in a larger geographical area have been maintained, the method of proof of and distribution of damages require close attention. In this respect the cases cited by plaintiff are totally inapplicable, because they support a type of "fluid recovery" theory of damages that has been rejected by subsequent opinions, the reasoning of which this Court adopts. In fact, the *Eisen* opinion cited by plaintiffs was reversed by the Court of Appeals upon that very point.

> "We hold the 'fluid recovery' concept and practice to be illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper." 479 F.2d 1005, at 1018 (Eisen III) vacated on other grounds, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

The concept of "fluid recovery" involves a full scale trial at which time the "gross damages" to "the class as a whole" are assessed. This damage fund is paid into the court and the distribution of damages begins by processing claims with the residue being applied in some way for the benefit of the class.

Since notice in the instant case will not constitute the problem it did with the six million people *Eisen* sought to represent, it is not predictable that the instant case will generate an equally "huge residue". But aside from that point, substituting "the class as a whole" for the individual members troubled the Second Circuit greatly:

> "That the claims of many may not be treated collectively or as 'the class as a whole' is what the Supreme Court decided in *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969) . . . ." 479 F.2d at 1014.

As in *Eisen,* the issues here are fully contested, making the methods used in *West Virginia v. Charles Pfizer & Co., supra,* distinguishable and inapplicable. See *Eisen III,* 479 F.2d at 1012.

The Court finds that the opinions in the antibiotic anti-trust actions cited previously are not applicable. The language clearly reveals that the Court contemplated a type of "fluid recovery".

> "The court's tentative conclusions concerning the trial of the damage issue eases the management problems considerably. Damages would be awarded on a class-wide basis, if and when liability was established, and individual claims could be processed administratively after entry of judgment." 333 F.Supp. 278, at 283.

> "The defendants have not argued that damages cannot be accurately computed by reliance on sales figures, and the court has concluded, on the basis of information developed to date, that they could not so contend. . . . In these circumstances the court cannot conclude that the defendants are constitutionally entitled to compel a parade of individual plaintiffs to establish damages." 333 F.Supp. 285, at 289.

It appears that the Court envisioned the antibiotic cases as classic type of price-fixing cases as discussed in *Bogosian v. Gulf Oil Corp., supra,* where individual damages require only proof of the number of units purchased by each claimant. Here the defendants vigorously oppose any notion that damages

can be computed by reliance on sales figures and distributed by statistical or computer techniques. The Court agrees that no formula would be workable in assessing damages in the present action due to the many variables and the time that would be required to compute the damages would consume years of judicial resources.[9]

The fact that plaintiffs demand trial by jury adds yet another stumbling block to the plaintiffs' assertion that this case would be manageable as a class action.

> "Certifying class actions, when everyone recognizes that the individual claims can never be fully litigated, with the constitutionally guaranteed right of trial by jury, because of the prohibitive cost of litigation, does not lend itself to 'a fair and efficient adjudication of the controversy' and violates the purposes of Rule 23 class actions." *Bogosian v. Gulf Oil Corporation, supra,* at 139.

Also see *Schaffner v. Chemical Bank,* 339 F.Supp. 329, 337 (S.D.N.Y.1972) and *Gneiting v. Taggares,* 62 F.R.D. 405, 407 (D.Idaho 1973).

## SUPERIORITY

In addition to the question of predominance, Rule 23(b)(3) provides for a finding by the Court "that a class action is *superior* to other available methods for the *fair* and *efficient* adjudication of the controversy." (emphasis added)

> "The superiority element has two facets, although these may not appear as separate in many cases. That is, this criterion should be measured by determining whether it would be worth-

while for the judge and the parties to devote the time and attention necessary to formulate workable methods for disposing of the group claims within one representative action, and, furthermore, whether it would be just to do so even if it would be convenient. (footnote omitted)." 3B *Moore's Federal Practice,* ¶ 23.45[3], pgs. 23–801 and 802 (1974 edition).

Both fairness and efficiency have been discussed previously under the headings of predominance and manageability. It is clear that the innumerable individual factual determinations necessary to prove liability, coupled with the vast amount of documentation on the issue of individual damages would tie up much of the Court's time and resources for a number of years. There is no way to gloss over the fact that these problems exist.

> "Amended Rule 23 was not intended to affect the substantive rights of the parties to any litigation. Nor could it do so as the enabling act that authorizes the Supreme Court to promulgate the Federal Rules of Civil Procedure provides that 'such rules shall not abridge, enlarge or modify any substantive right.'" (See 28 U.S.C. § 2072) *Eisen III, supra,* at 1014.

Aside from proof of liability, determining the amount of damages and a proper distribution thereof would result in an unfair trial if a fluid recovery approach were utilized; and, since a fluid recovery approach cannot be utilized, a class action trial would be inefficient because of the individual determinations that must be made which would be, to some extent, duplicative[10] of the determinations made in establishing liability.

9. Assuming that it would take an average of one hour per class member to analyze his sales records for over four years and his possible relationship with other producers, it would take 20,000 hours, or 10 years of judicial time, assuming that the case was given undivided attention for 40 hours per week and 50 weeks per year.

10. As discussed previously under the heading of Predominance it is anticipated that defendants will attempt to show that, assuming a conspiracy is proven, the sales of lower quality tobacco give rise to no liability or result in less damage per pound than higher quality tobacco.

There is another point that should be made in regard to damages. It seems unrealistic to the Court that an expert could qualify to give opinions concerning the competitive price of 161 different grades of flue-cured tobacco on each sales day, for each of the four years and at each warehouse.

Another topic commonly discussed under the heading of superiority is the substantiality of individual claims. This topic is important because Rule 23 does provide for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture. The impact of this procedural mechanism is a most valuable privilege where the individual claims would be too small to justify separate litigation. See 3B *Moore's Federal Practice, supra,* at pg. 23–802.

The present case does not represent a situation that exists in many class actions where denial of the class action sounds a "death knell" to the claims of the named plaintiffs and the class as a whole. Based on the estimate of class size (20,000) and the demand for money damages included in the complaint ($335,811,390.00) the average claim would exceed $16,000.00. It appears that the six named plaintiffs are at least average tobacco producers in terms of acreage and sales; therefore, their combined claims would warrant maintenance of this suit on an individual basis, especially since the Anti-Trust Act provides for awarding of attorney's fees.

In a recently filed affidavit plaintiff Nexsen affirmed his 1975 crop to be 100,000 pounds. If he could prove a damage of $.10 per pound for four years with treble damages a recovery of $120,000.00 plus costs and attorney's fees would result. From the deposition of Nexsen it appears that he has substantially increased his acreage by additional leases since 1970 and he now has 50 acres, so the 100,000 pounds would not apply for each year, but these figures do indicate that the individual claims of plaintiffs are quite substantial.

Testimony shows the other plaintiffs farm the following tobacco acreage:

| Windham | 31 acres |
|---|---|
| Evans | 8 acres |
| Skipper | 25 acres |
| Turner | 30 acres |
| Gaskins | 20 acres |

If they obtain approximately the same yield per acre as Nexsen does, the amount of their recovery for the four years with treble damages could be quite large.

Some of these plaintiffs share crop or have tenants as to some acreage, and these persons have an interest in the crop, but it would be easy to join them as plaintiffs in the present action.

While many producers, such as a sharecropper on a very small allotment, would not have claims sufficient to warrant an independent anti-trust suit of this type, they could seek to join the present action as named plaintiffs. This is not an unrealistic statement in view of the widespread publicity this case has received since its inception. Of course, even if many small claimants are effectively precluded from asserting their claims, this is not a valid reason to ignore the provisions of Rule 23.

## BIFURCATION

Under the headings of predominance and superiority the Court has mentioned the feasibility of bifurcating this action, that is planning to try the issue of liability separate from the issue of damages. To reiterate, the Court's position is that a split trial is not, as plaintiffs contend, a panacea for the problems that this case poses, especially the problems of manageability.

In taking this position the Court is not unmindful of the decisions in cases such as *Samuel v. University of Pitts-*

*burgh,* 506 F.2d 355 (3rd Cir. 1974); *Partain v. First National Bank of Montgomery,* 59 F.R.D. 56 (M.D.Ala, N.D. 1973); *Herrmann v. Atlantic Richfield Company,* 65 F.R.D. 585 (W.D.Penn. 1974); *Mosley v. General Motors Corporation,* 497 F.2d 1330 (8th Cir. 1974); *Matarazzo v. Friendly Ice Cream Corporation,* 62 F.R.D. 65 (E.D.N.Y.1974); *City of Philadelphia v. Emhart Corporation,* 50 F.R.D. 232 (E.D.Pa.1970); *State of Minnesota v. United States Steel Corp.* 44 F.R.D. 559 (D.Minn. 1968); *Like v. Carter,* 448 F.2d 798 (8th Cir. 1971), cert. denied, 405 U.S. 1045, 92 S.Ct. 1309, 31 L.Ed.2d 588 (1972); *Esplin v. Hirschi,* 402 F.2d 94 (10th Cir. 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); *Gerstle v. Continental Airlines, Inc.,* 50 F.R.D. 213 (D.Col.1970); *Katz v. Carte Blanche Corp.,* 52 F.R.D. 510 (W.D.Pa.1971) and *Professional Adjust. Sys., Inc. v. General Adjust. Bur., Inc.,* 64 F.R.D. 35 (S.D.N.Y.1975). The Court finds that these cases are distinguishable in terms of numerosity of the purported class, the type Rule 23(b) class action sought, or the extent to which discovery revealed to the respective courts a realistic view of the problems of manageability.

## CERTIFICATION FOR APPEAL

Denial of class action status is not normally a final order appealable under 28 U.S.C. § 1291; however, the Court feels that an expedited review by the Fourth Circuit Court of Appeals is appropriate in this case.

Class action determinations are certified for appeal under either 28 U.S.C. § 1292(b) or Rule 54(b) of the Federal Rules of Civil Procedure. Since this Order is the culmination of a thorough investigation into the class status issue resulting in a denial of plaintiffs' motion to represent approximately 20,000 others similarly situated, Rule 54(b), governing

judgments upon multiple claims or involving multiple parties, seems more suited to this case. Therefore, the Court certifies pursuant to Rule 54(b) that this Order dismissing the complaint against the absent class members is a final judgment as to them. Judgment shall be entered accordingly and the Court finds no just reason for delay of an appeal. An additional reason for this certification is the Court's awareness that similar actions are pending in the Federal Courts of North Carolina and Kentucky involving many of the same defendants and alleging anti-trust violations in the purchase of tobacco.

## CONCLUSIONS

Based on all of the foregoing, the Court finds that the evidence presented does not justify the maintenance of the class action alleged; therefore, plaintiffs' motion for class certification is denied.