D. Lamar DELOACH, William G. Hyman, Hyman Farms, Inc., Guy W. Hale, James R. Smith, Houston T. Everett, D. Keith Parrish, Plaintiffs,

v.

PHILIP MORRIS COMPANIES, INCORPORATED, Philip Morris Incorporated, Philip Morris International, Inc., R.J.R. Nabisco Holdings Corp., R.J. Reynolds Tobacco Holdings, Inc., R.J. Reynolds Tobacco Company, B.A.T. Industries, P.L.C., British American Tobacco Company, Inc., Batus Holdings Incorporated, Brown & Williamson Tobacco Corporation, Lorillard Tobacco Company, Loews Corporation, Universal Leaf Tobacco Co., J.P. Taylor Co., Inc., Southwestern Tobacco Co., Inc., Dimon Inc., Standard Commercial Corp., Defendants.

No. 1:00CV1235.

United States District Court, M.D. North Carolina.

April 3, 2002.

**552**

Alan M. Wiseman, Joseph A. Ostoyich, Howrey Simon Arnold & White, LLP, Robert F. Ruyak, Kenneth C. Anderson, Robert L. Green, Jr., Thomas A. Isaacson, Jason D. Smith, Howrey Simon Arnold & White, LLP, Alexander J. Pires, Jr., Ingrid Hutto, Conlon Frantz Phelan & Pires, LLP, Washington, DC, J.L. Chestnut, Chestnut Sanders Sanders & Pettaway, P.C., Selma, AL, Richard M. Hutson, II, Durham, NC, for plaintiffs.

Douglas L. Wald, Arnold & Porter, Washington, DC, Angela L. Little, Smith Helms Mulliss & Moore, LLP, Greensboro, NC, Daniel R. Waldman, Donna E. Patterson, Robert J. Jones, Mark R. Merley, Anthony J. Franze, Michael D. Yeh, Mark J. Montano, Sarah B. Kotler, Arnold & Porter, Washington, DC, David Boies, Boies Schiller & Flexner, LLP, Armonk, NY, Donald L. Flexner, Amy J. Mauser, Boies Schiller & Flexner, Washington, DC, James Donald Cowan, Jr., Dixie Thomas Wells, Smith Moore, L.L.P., Greensboro, NC, Lisa Frye Garrison, Smith Moore, L.L.P., Raleigh, NC, W. Andrew Copenhaver, Womble Carlyle Sandridge & Rice, Winston–Salem, NC, Paul A. Kaplan, Womble Carlyle Sandridge & Rice, PLLC, Washington, DC, William Kearns Davis, James R. Fox, Stephen McDaniel Russell, Troy Douglas Cahill, Bell Davis & Pitt, P.A., Winston–Salem, NC, Stephen R. Patton, Jeffrey L. Williams, Jeffrey L. Willian, Kirkland & Ellis, Chicago, IL, Kenneth N. Bass, Kirkland & Ellis, Washington, DC, James T. Williams, Jr., Jennifer Van Zant, Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, Harold H. Chen, Brooks Pierce McLendon Humphrey & Leonard, L.L.P., Raleigh, NC, Peter J. Kadzik, R. Bruce Holcomb, Barry J. Fleishman, James Van R. Springer, Dickstein Shapiro Morin & Oshinsky, LLP, Washington, DC, Wade Marvin Smith, Tharrington Smith, Douglas W. Kenyon, Hunton & Williams, Raleigh, R. Noel Clinard, Hunton & Williams, Richmond, VA, Jeffrey B. Welty, David William Long, Poyner & Spruill, L.L.P., Joseph E. Zeszotarski, Jr., Raleigh, NC, for defendants.

## MEMORANDUM OPINION and ORDER

OSTEEN, District Judge.

This matter is before the court on Plaintiffs' motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. The complaint underlying the motion at issue alleges that antitrust violations were committed by Defendants Philip Morris, Inc., R.J. Reynolds Tobacco Co., Brown & Williamson Tobacco Corp., and Lorillard Tobacco Co. (collectively, Manufacturer Defendants) and Universal Leaf Tobacco Co., J.P. Taylor Co., Inc., Southwestern Tobacco Co., Inc., DIMON, Inc., and Standard Commercial Corp. (collectively, Buyer Defendants).[1] Specifically, Plaintiffs, quota holders and direct sellers of flue-cured and burley tobacco during the relevant time period, allege that, since a date unknown to Plaintiffs but prior to 1996, Defendants anticompetitively lowered tobacco prices through a conspiracy to rig bids at auction, to submit decreased purchase intentions to reduce the federal tobacco quota, and to refuse to purchase quantities of tobacco at auction in order to purchase them at an artificially low discount from tobacco cooperatives. Plaintiffs brought this action seeking treble damages, costs, and attorneys' fees. The factual background has been discussed in greater detail in the court's July 24, 2001, memorandum opinion and order denying Defendants' joint motions for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). The named Plaintiffs are as follows: D. Lamar DeLoach, William G. Hyman, Hyman Farms, Inc., Guy W. Hale, James R. Smith, Houston T. Everett, and D. Keith Parrish. Plaintiffs seek to certify the following class: (1) all persons

---

1. Defendant Manufacturers and Defendant Buyers are referred to collectively as Defendants.

(including corporations and other entities) holding a quota to grow flue-cured or burley tobacco in the United States at any time from February 1996 to the present and (2) all domestic producers of flue-cured or burley tobacco who sold such tobacco in the United States at any time from February 1996 to the present. Plaintiffs maintain that class certification is proper because the requirements of Rule 23(a) and Rule 23(b)(3) have been satisfied. Plaintiffs and Defendants have conducted extensively discovery on the issue before the court, and they have submitted numerous exhibits and affidavits indicating their proposed methods of proof.[2] For the reasons stated herein, the court will grant Plaintiffs' motion and certify a class pursuant to Rule 23.

## I. INTRODUCTION

The debate over class certification centers on the nature of the tobacco industry. Defendants argue that determining the competitive price of an allegedly non-fungible product like tobacco would require an individualized assessment of each sale. Plaintiffs, on the other hand, contend that tobacco is fungible and therefore susceptible to a determination of classwide impact from the alleged conspiracy. The United States Department of Agriculture (USDA) oversees tobacco production through a federal support program. The facts concerning the federal support program have been stated in more detail in the court's July 24, 2001, memorandum opinion.

Producers may only grow tobacco under a quota issued by the USDA. The annual quota is derived from a statutory formula that factors in Defendant Manufacturers' domestic tobacco purchase intentions, the average tobacco exports from the United States for the past three years, and the amount by which the tobacco reserve exceeds or falls below a statutorily set limit. The tobacco quota has decreased by 47 percent for burley tobacco and 49 percent for flue-cured tobacco since 1997, which far exceeds any reductions in domestic cigarette demand. (*See* Third Am. Compl. at 24.) Some class members are growers who lease their quota from quota holders, others are both quota holders and growers, and others are quota holders who lease their entire quota.

Tobacco has historically been sold at auction in more than 300 warehouses located throughout 13 states. (*See* Joint Mem. Opp'n Mot. Certify at 8.) From 1996 through 2000, well over a billion pounds of burley and flue-cured tobacco were sold at auction in individual piles or bales of several hundred pounds each. (*See id.*) Some tobacco has also been sold through private contract in recent years. The USDA sets a minimum price for each grade of tobacco sold at auction. There are 264 grades of flue-cured and burley tobacco recognized by the USDA. (*See id.*) The USDA grades are subject to a range of federal price supports that are calculated according to a federally mandated formula. Tobacco prices vary by grade, auction, and time of year.

If no buyer bids the minimum price or the grower is not willing to accept any proffered bids, the tobacco is sold to an agricultural cooperative, or reserve, for the minimum price. By law, the growers and Defendant Manufacturers must pay a "no net cost assessment" (NNCA) to enable the cooperatives to operate at no cost to the federal government. Each grower pays the same percentage NNCA. The amount of tobacco sold to the reserves has increased since 1997, raising the NNCA's. Plaintiffs allege that Defendants conspired to fix auction prices, to falsely reduce their purchase intentions, thereby decreasing the quota, and to lower

---

2. The court will determine the propriety of class certification based on the extensive briefs and exhibits submitted by the parties. An evidentiary hearing on class certification is unnecessary, as both parties have thoroughly briefed their positions.

The court notes that Defendants have submitted a motion to strike deposition errata sheets filed by Plaintiffs, which seek to provide further explanation of deposition testimony. In addition, Plaintiffs filed a motion to strike certain portions of Defendants' rebuttal expert report and for other sanctions related to Defendants' alleged failure to timely provide USDA grade information from the Tobinet. The court will consider these motions in a separate order, but notes that it has not considered either the errata sheets submitted by Plaintiffs or the contested portions of the rebuttal expert report in arriving at the class certification decision.

their purchases at auction to buy the reserve tobacco at a significant discount at a later date. Plaintiffs contend that the alleged conspiracy therefore resulted in losses from anticompetitive prices, reduced value of quota, and higher NNCA's.

## II. REQUIREMENTS OF RULE 23

■ In ruling upon a motion for class certification, courts treat the substantive allegations contained in the plaintiffs' complaint as true. *See Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975) (noting that this principle "necessarily make[s] the class order speculative in the sense that the plaintiff may be altogether unable to prove his allegations . . . the court may not put the plaintiff to preliminary proof of his claim"). In *Eisen v. Carlisle & Jacquelin,* the Supreme Court stated that "[w]e find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974) (citation omitted). The *Eisen* Court found that the district court improperly required the defendants to bear 90 percent of the cost of notification after determining that the plaintiffs were more likely than not to prevail. When determining whether to certify a class, the question for the court "is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id.* at 178, 94 S.Ct. at 2153.

■ Though the Supreme Court was concerned with a decision that prejudiced the defendants, its holding that the likelihood of prevailing should not have any bearing on the certification of a class likewise applies to prevent denial of certification where the court believes the plaintiffs will not prevail on the merits.[3] Nonetheless, the Fourth Circuit has held that a court should conduct "at least a preliminary exploration of the merits" of the plaintiffs' claims to support its specific findings that the requirements of Rule 23

have been satisfied. *Shelton v. Pargo, Inc.,* 582 F.2d 1298, 1312 (4th Cir.1978); *see also Stastny v. Southern Bell Tel. & Tel. Co.,* 628 F.2d 267, 276 n. 12 (4th Cir.1980) (stating that "*Eisen* cannot of course be read to forbid any pre-trial inquiry designed to establish the class action criteria that happens to touch on matters that may also relate to the merits of the class or individual claims as alleged").

Defendants have voiced objections to the typicality and adequacy requirements of Rule 23(a). However, as is often the case in large antitrust actions seeking class certification, the parties most strongly contest the issue of whether questions of law or fact common to the class predominate over individual questions. The court must consider each of the requirements of Rule 23 in turn.

### A. Rule 23(a)

Rule 23(a) establishes four requirements for class certification which must be satisfied before the court proceeds to consideration of Rule 23(b). Under Rule 23(a), one or more representatives may bring an action on behalf of a class only if: (1) the class is so numerous that joinder is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the class; and (4) the representatives will fairly and adequately protect the interests of the class.

### 1. Numerosity

Plaintiffs estimate that the class they seek to represent numbers at least in the tens of thousands. Defendants have not contested Plaintiffs' assertion that the requirement of numerosity is met. There is no question that joinder of so many individuals, geographically dispersed throughout many states, would be impracticable. Therefore, Plaintiffs have satisfied this requirement.

### 2. Commonality

Defendants likewise do not contest Plaintiffs' argument that common questions of law

---

**3.** In stating this proposition, the court emphasizes that it makes no comment as to whether Plaintiffs are likely or unlikely to prevail. As dictated by Rule 23 and the Supreme Court, that question will be considered at the proper time pursuant to the proper motion.

and fact exist in this case. Each plaintiff would have to show the existence of a conspiracy to fix, stabilize, and maintain prices, allocate sales, and limit the production of tobacco in violation of section 1 of the Sherman Act. In addition, each plaintiff would have to prove that Defendant Manufacturers abused their market power in carrying out the alleged conspiracy in violation of section 2 of the Sherman Act. "Obviously, individual actions designed to prove identical elements would completely destroy any notions of judicial economy." *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1034 (N.D.Miss.1993). Thus, whether or not Defendants violated the antitrust laws is a common issue of fact and law. The court must also determine whether these common questions predominate pursuant to Rule 23(b)(3), as analyzed below.

### 3. Typicality

The requirement of typicality overlaps considerably with the requirements of commonality, adequacy of the class representatives, and Rule 23(b)(3). *See Catfish Litig.*, 826 F.Supp. at 1034; *General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982). "The second Rule 23(a)(3) requirement is that the representative claims be typical of the other members of the class. This has consistently been held to mean that his claim cannot be antagonistic to the claims of other members." *Windham v. American Brands, Inc.*, 68 F.R.D. 641, 649 (D.S.C.1975) [hereinafter *Windham I*] (citing *Thomas v. Clarke*, 54 F.R.D. 245, 251 (D.C.Minn.1971)). Not surprisingly, Defendants combine their Rule 23(a)(3) and (a)(4) analyses, since both have the purpose of ensuring that the interests and goals of the named representatives are aligned with those of the proposed class.

▇ Appropriately, the court must consider Defendants' argument regarding conflicts among class members under the representation requirement. Aside from the requirement that Plaintiffs have no conflicts with class members regarding the litigation, typicality is satisfied when the claims of the representatives arise from the same facts or are based on the same legal theory as those of the class members. *See, e.g., Friedland v. Coastal Healthcare Group, Inc.*, Civ. Nos. 1:95CV306, 1:95CV310, 1:95CV323–324, 1996 U.S. Dist. LEXIS 16088, at *7 (M.D.N.C. Sept. 12, 1996); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 690 (D.Minn.1995). The fact that Plaintiffs sold various grades of tobacco at different auction locations does not mandate a finding of lack of typicality. *See Catfish Litig.*, 826 F.Supp. at 1036.[4] Except as to the amount of damages claimed by each plaintiff, the claims of the class representatives stem from the same facts and legal theories regarding the alleged price-fixing conspiracy as those of the rest of the class. The fact that the class includes small farmers, corporations, and various types of tobacco producers in between does not destroy typicality—"[c]ollectively, the plaintiffs are typical purchasers, and their diversity can only strengthen their ability to represent absent class members that vary in size, geographical location, and buying [in this case, selling] patterns." *Catfish Litig.*, 826 F.Supp. at 1036. Defendants argue that, in keeping with their assertion that classwide proof of impact is impossible, each plaintiff will have to prove that the alleged conspiracy affected his or her individual sales, so no plaintiff's claim will be typical of another's. In addition, Defendants contend that individualized

---

4. The court in *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1036–37 (N.D.Miss.1993), cites a number of antitrust cases in which typicality was satisfied where the claims were based on the same legal theory. *See In re Domestic Air Transp.*, 137 F.R.D. 677, 699 (N.D.Ga.1991) (finding that plaintiffs' claims stemmed from the same legal theory as class claims, notwithstanding that class members purchased tickets at different prices under varying conditions); *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 270 (D.Minn.1989) (finding that claims were sufficiently typical of entire class where representa-

tives had to prove existence, scope, and impact of an alleged nationwide conspiracy); *United Nat'l Records, Inc. v. MCA, Inc.*, 99 F.R.D. 178, 181 (N.D.Ill.1983) (finding that, while product diversity might affect the amount of recovery, it did not negate typicality because all class members shared the same claim arising from an alleged conspiracy); *Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 566 (D.Minn.1968) (holding that claims of representatives were typical since proof of conspiracy and price fixing were common to all, despite the existence of diverse methods of procuring and producing fabricated steel).

proof of damages destroys typicality. However, "Rule 23(a)(3) does not require that all members of a proposed class pay [or, in the case of an oligopsony, be paid] the same amount or use similar purchase [or sale] methods in order to pursue an antitrust price-fixing claim." *Potash Litig.,* 159 F.R.D. at 690–91. These issues are addressed with respect to Rule 23(b)(3). Because the court finds that common questions of fact and law predominate for the reasons discussed below, there is no impediment to a finding of typicality in this respect. Thus, the court finds that Plaintiffs have shown that their claims are typical of the proposed class.

### 4. Fair and Adequate Representation

There are two ingredients that comprise the final requirement of Rule 23(a):

> To be sure, an essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation. Additionally, it is necessary to eliminate so far as possible the likelihood that the litigants are involved as a collusive suit or that plaintiff has interests antagonistic to the remainder of the class.

*Windham I,* 68 F.R.D. at 649 (citing *Eisen,* 391 F.2d at 562–63). Defendants do not challenge the qualifications of Plaintiffs' counsel to handle the proposed class action. The court recognizes that Plaintiffs are represented by experienced counsel who have undertaken numerous class actions and antitrust suits, including several in the field of agricultural litigation. Therefore, Plaintiffs' counsel satisfy Rule 23(a)'s representation requirement.

■ Defendants contend, however, that Plaintiffs cannot fairly and adequately represent class members because irreconcilable conflicts exist between the grower members of the class and the quota holders. They cite *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 338–39 (4th Cir. 1998), as support for their position. However, *Broussard* is distinguishable because the proposed class included both individuals who had signed a waiver as to any claims and individuals who were pursuing the same claims. The court found that the parties could not be adequately represented when one group wanted funds restored to an advertising account, an equitable remedy, while the other wanted to recover monetary damages.

Defendants argue that the class cannot recognize parties from both sides of quota lease contracts because the lessors and lessees would suffer "profoundly different" impact from the alleged conspiracy. (Joint Mem. Opp'n Certify at 35.) They base this contention on the allegation that the value of the tobacco quota increases as the amount of quota decreases, resulting in no impact to the quota holders. Thus, Defendants contend that while quota holders would want to prove that reduced quota size reduced the value of their quota, growers would want to argue that the reduced size resulted in higher rents. Further, Defendants argue that a similar conflict exists because only growers would suffer direct harm from the alleged bid rigging, whereas quota holders would only suffer indirect damages in the form of lower rents caused by lower tobacco prices. Finally, Defendants submit that there are conflicting views among class members about direct contracting and preservation of the tobacco program. In *Windham I,* the defendant tobacco manufacturers likewise argued that Rule 23(a)(4) was not satisfied because there were conflicting positions on grower designation of warehouses. *See* 68 F.R.D. at 649.

Plaintiffs argue in response that "growers are suing for depressed auction prices and higher assessments; quota holders are suing for the quota cuts." (Reply Mem. Supp. Mot. Certify at 3.) Though Defendants characterize Plaintiffs' argument as a relinquishment of potentially viable claims or remedies of absent class members, Plaintiffs' third amended complaint does not state that Plaintiffs seek all types of damages for all class members. It merely states that Plaintiffs seek to recover the amount of damages sustained by each of them as a result of the conspiracy. Plaintiffs cite *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), for the principle that only the first party in the chain of injury may

sue for damages in price-fixing cases.[5] Thus, any loss suffered by quota holders to rent because of reduced tobacco prices is a secondary loss that cannot be recovered. Further, the fact that quota holders may have recouped some of their losses from reduced quota by raising rents does not affect Defendants' liability for the reduced quotas. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *see also Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977) (stating that "it is precisely for this reason [the complexities of proving that some dealers were not harmed because they recovered the loss by raising prices] that the Supreme Court eliminated the 'passing-on defense' in *Hanover Shoe*").

Further, the court does not find that any differences in opinion regarding private contracts and the federal support program require denial of class certification. First, Plaintiffs have not asserted any claims for damages based on either issue. Second, "antitrust issues override the differences of opinion among members of the purported class on [other issues]." *Windham I*, 68 F.R.D. at 650. Despite the fact that the proposed class in *Windham I* contained both growers and quota holders, the court found that the representation requirement was satisfied. That court noted that "at least some adversity among members of the purported class does exist" but found that any such adversity "could be reconciled with Rule 23 without destroying the class entirely." *Id.* at 649. In addition, the court mentioned the possibility of denying certification as to certain claims or using subclasses to separate the opposing views. This court could employ similar methods, should the need arise in the future.

For the present, however, the court does not find that Rule 23(a)(4) cannot be satisfied because of the conflicts described by Defendants. As was the case in *Windham I*, the court does not find any evidence that there are class members "who benefit from tie bidding on an overall basis." *Id.* at 651. This action centers on the alleged antitrust conspiracy, and both quota holders and growers are harmed by such conduct. Thus, Plaintiffs have shown that they are fair and adequate representatives for the proposed class.

## B. Rule 23(b)(3)

### 1. Introduction

■ In addition to meeting the requirements of Rule 23(a), the class in this case must satisfy Rule 23(b)(3),[6] which permits certification if:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Rule 23(b)(3) lists the matters pertinent to these findings as follows: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action. *See* Fed.R.Civ.P. 23(b)(3). As will be discussed under the superiority requirement, the expense and complexity of this action weigh in favor of a class action. Unlike many class actions, part (B) is not a consideration because this case does not involve the consolidation of separate suits. Be-

---

**5.** While Defendants now contend that *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), is not controlling on the issue of whether growers have a claim for reduced quota, they earlier stated that "[c]lass members who do not own quota obviously suffer no direct impact from any quota reduction." (Joint Mem. Opp'n Mot. Certify at 27.) The *Illinois Brick* rule does not allow a plaintiff who

buys a product from a retailer to sue the original supplier for price-fixing. Though Defendants argue that growers are not in the same position as the buyer, growers only suffer losses from reduced quota via their lease agreements with quota holders, who suffer the direct loss.

**6.** Neither Rule 23(b)(1) nor (b)(2) is applicable under the facts of this case.

cause claims have not been raised in another forum, part (C) also is not a factor. Manageability is discussed below.

In determining whether Rule 23(b)(3) is satisfied, the court must keep in mind that every private antitrust action requires proof of three elements: (1) an antitrust violation; (2) direct injury, or impact, to the plaintiff from such violation; and (3) damages sustained by the plaintiff. *See Windham v. American Brands, Inc.*, 565 F.2d 59, 65 (4th Cir.1977) [hereinafter *Windham III*].[7] Defendants argue that an auction-by-auction approach is required to prove that tie bids occurred. A similar defense was raised in *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 249 (S.D.Tex.1978), but the court rejected the argument that the plaintiffs would "have to build their case like a patchwork quilt" where the proposed evidence was suitable for proof of an industry-wide conspiracy. 80 F.R.D. at 250.

### 2. Past Tobacco Antitrust Cases

Defendants rely heavily on *Windham III* and its progeny, *Galloway v. American Brands, Inc.*, 81 F.R.D. 580 (E.D.N.C.1978), for their contention that tobacco bid-rigging cases are not appropriate for class certification.[8] While *Windham III* and *Galloway* have many facts in common with this case, there are some key distinctions. Both cases involved antitrust claims against tobacco manufacturers, and the courts engaged in detailed discussions of the tobacco industry. Nonetheless, the underlying factual allegations of a case are always critical in determining whether class certification is proper,

and Defendants overstep the parameters of *Windham III* and *Galloway*.

Defendants' chief argument is that tobacco is a non-fungible product, making proof of classwide impact and individualized damages calculation impossible. Defendants cite *Windham III* and *Galloway* for support of the contention that the "but for" price of each class member's tobacco cannot be determined without referring to a variety of factors that vary by geography and time. However, both cases operate on the assumption that there were no means of determining classwide impact because no economic formulas were available. Without such a percentage impact on the entire market, it would be impossible to calculate each plaintiff's losses without resorting to individual trials.

The court notes that the *Galloway* court stated that it was compelled to draw the same conclusions as *Windham III;* thus, the analysis presented in *Galloway* simply restates the arguments made in *Windham III*. Moreover, the *Galloway* court focused on the fact that some defendants did not purchase tobacco at all auctions. However, case law clearly holds that co-conspirators are jointly liable for all acts in furtherance of the conspiracy. *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646, 101 S.Ct. 2061, 2069–70, 68 L.Ed.2d 500 (1981) (recognizing that antitrust defendants are jointly and severally liable for violations but refusing to recognize a right of contribution); *Westinghouse Elec. Corp. v. Rio Algom Limited,* 617 F.2d 1248, 1257 (7th Cir.1980) (stating that "[a]nti-trust liability under Section 1

7. *Windham I* was reversed by a panel of the Fourth Circuit in *Windham v. American Brands, Inc.*, 539 F.2d 1016 (4th Cir.1976), which held that the district court abused its discretion in denying class certification. The Fourth Circuit, meeting *en banc*, then affirmed the district court in *Windham v. American Brands, Inc.*, 565 F.2d 59 (1977) (*Windham III*).

8. Defendants also argue that the Fourth Circuit's very recent decision in *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138 (4th Cir.2001), reflects the Fourth Circuit's continued reliance on *Windham III*. However, the Fourth Circuit in *Lienhart* vacated the district court's class certification because the defense of contributory negligence necessarily required individualized consideration of impact. While the Fourth Circuit did cite *Wind-*

*ham III*, it was for the proposition that the need for individualized proof of damages may defeat predominance where proof of damages is essential to liability, a principle considered by this court and found to be in keeping with class certification in this case. *See id.* at 149. Proof of damages, in other words, impact—was not susceptible to common proof not because of the industry, but because there was no way to mathematically determine whether individual contractors properly used the product. In the present case, on the other hand, the only variable the court is dealing with is price—if a conspiracy is shown to have reduced all prices, then there is no need to look at each individual sale because grade variations and other localized conditions were already factored into the original price.

of the Sherman Act is joint and several"). Defendants correctly assert that class certification would not be appropriate if it were impossible to determine a classwide impact. However, the court finds that Plaintiffs have shown that the tobacco market is susceptible to such proof for the reasons that follow.

There are several other important distinctions between the facts stated in *Windham I* and this case. The *Windham* plaintiffs only alleged that tie bidding occurred in some auctions and for some grades, mainly the high ones, whereas Plaintiffs allege a conspiracy to fix prices on all grades at all auctions. In addition, the *Windham* plaintiffs alleged a series of conspiracies rather than one overarching conspiracy. This distinction meant that the *Windham* plaintiffs could not allege a classwide impact because it was not supported by the factual allegations of the complaint; that is not the case here. Further, Plaintiffs note that the attorney in *Windham* appeared to be a sole practitioner, explaining the court's skepticism regarding the development of economic proof.[9] On the other hand, Plaintiffs' counsel is experienced in complex class actions, as is their expert.

At the time of *Windham I*, there were many small buyers who no longer exist. The market was not concentrated as it is today, with roughly 95 percent of domestic tobacco being purchased by Defendants. Moreover, the *Windham* plaintiffs conceded that some purchases did not give rise to their antitrust claims and that a substantial amount of tobacco was sold to non-defendant buyers. Plaintiffs, on the other hand, allege that all auctions were affected by the conspiracy, and such a small amount of tobacco was purchased by non-defendants that those sales would have been affected, as well. Finally, there was no ready source of sales data in *Windham I*, whereas Plaintiffs have access to Tobinet, a network jointly created by Defendants and the tobacco stabilization boards containing information of prices, volumes, internal grades, buyers, and sellers. In addition, the USDA gathers and tabulates data relating to a wide range of tobacco issues.

Antitrust defendants (Defendants in this case are no exception) have often cited *Windham III* for the proposition that "the issues of injury and damage [and not the conspiracy] remain the critical issues in such a case and are always strictly individualized." *Windham III*, 565 F.2d at 66. However, what is not revealed is the context in which the Fourth Circuit made that statement. The Fourth Circuit was rejecting the notion of a "fluid class" or "fluid recovery" in which plaintiffs could show a generalized or classwide proof of damages in a private antitrust action. *See id.* Plaintiffs do not seek recovery under a fluid recovery theory. Rather, they argue that individual damages can be established through the use of economic formulas. The Fourth Circuit in no way rejected the use of formulas, but rather found that "there is a substantial basis for the district court's conclusion that there appears to be no workable formula to aid in computing the damages of each member of the plaintiff class." *Id.* at 70. In *Windham I*, however, the plaintiffs had only promised to develop a formula at some point; there was no evidence that workable formulas existed.

The court is dealing with a very different situation almost 25 years later. Class actions of this magnitude have become commonplace, and scientific methods exist to address the difficulties attendant in proving impact and damages to thousands of class members. Though Defendants argue that tobacco is inherently unique from the types of products which have been the subject of antitrust suits in the past, including flights from multiple locations with a number of fares for each city, corrugated containers of varying shapes and sizes, and other commodities such as catfish and potash, the court does not find tobacco to be in a league of its own separate from and so unique as to be immune to any antitrust challenge.

Though *Windham III* provides much basis for argument, it does not prevent the court from conditionally certifying a class in this case. The posture of *Windham III* is of crucial importance in determining its impact. The Fourth Circuit in *Windham III* an-

---

9. Plaintiffs state that the counsel page of the amended complaint read "E.N. Ziegler, Drawer 150, Florence, SC 29501." (Rev'd Mem. Supp. Mot. Certify at 40.)

swered the question of whether the district court had abused its discretion in denying class certification, a high bar to cross for the plaintiffs. Nowhere in *Windham III* did the Fourth Circuit state that the district court would have abused its discretion in granting class certification. It only determined that denial was "well within the wide range of discretion" granted the trial court. *Windham III*, 565 F.2d at 72.

Like the district court in *Windham I*, this court must weigh the evidence before deciding whether class certification is appropriate. The court finds that the facts in *Windham I* are distinct from the present case; further, based on the expert reports and other information before the court, it is possible to show that the alleged conspiracy had an impact on all class members. In addition, it is possible to determine individual damages without the administrative burdens destroying class certification. For the reasons that follow, the court finds that Plaintiffs have met the requirements of Rule 23(b)(3).

### 3. Predominance

Since common questions of fact and law do exist, the issue is whether they predominate, which requires more than Rule 23(a)(2). *See Windham I*, 68 F.R.D. at 651. The predominance test "really involves an attempt to achieve a balance between the value of allowing individual actions to be instituted so that each person can protect his own interests and the economy that can be achieved by allowing a multiple party dispute to be resolved on a class action basis." *Corrugated Container*, 80 F.R.D. at 249 (citation omitted). Defendants' argument is that the impact from the common legal theory of a conspiracy to fix prices and allocate supply cannot be proven on a classwide basis, nor can damages. Therefore, Defendants argue, the court would be required to conduct thousands of mini-trials to determine these individual questions.[10]

### a. Classwide Proof of Violation

The first question is whether, based on Plaintiffs' proposed proof, Plaintiffs have demonstrated that they will prove a classwide antitrust violation. Once an antitrust defendant argues that its case is exceptional because too many variables enter into setting prices in its industry to permit common proof of impact, "the court must examine the circumstances of the industry to determine whether common proof of impact is possible in that case." *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 382 (S.D.N.Y.1996). To prevail at trial, Plaintiffs must prove a market-wide conspiracy, which they contend they will do with documents showing price information exchanges, directives from Defendant Manufacturers to Defendant Buyers, internal documents reflecting those policies, and affidavits and depositions from warehousemen, growers, and employees of Defendants.[11]

Defendants argue that Plaintiffs must show how they will prove such a conspiracy, given the vast number of auctions and local individuals involved. Plaintiffs, however, are not required to prove the existence of the conspiracy at this stage. "Whether the proof ultimately adduced will establish the existence of a national conspiracy among the defendants is not an issue here; it is not the court's function to weigh this evidence for its truth but merely to ascertain whether it is of a type suitable for classwide use." *Corrugated Container*, 80 F.R.D. at 250. The court finds that the questions of whether Defendants exchanged price information, agreed to fix auction prices and allocate tobacco, and took other steps to stabilize tobacco prices are susceptible of generalized proof. *See Catfish Litig.*, 826 F.Supp. at 1039 (stating that,

> [i]f proven, evidence of any meetings in Mississippi, telephone conversations, or

---

**10.** Defendants also contend that Plaintiffs cannot prove the allegation of product allocation without individualized consideration of the role played by warehousemen and auctioneers. However, their role is not relevant to the question of whether Defendants conspired to allocate the tobacco supply.

**11.** Plaintiffs have presented ample evidence, under seal, of Defendants' actions in support of class certification. The court should not engage in a determination of the credibility of the proposed evidence because that is a matter for the trier of fact.

other electronic communications in pursuit and furtherance of the alleged conspiracy would be the most relevant evidence that could be introduced in proving the allegations of plaintiffs' complaint of price fixing.... [S]uch evidence would be pertinent and common to all plaintiffs).

The existence of different auctioneers at different warehouses does not alter the central issue of whether Defendants conspired to control tobacco prices.

The proposed evidence is the type of generalized proof necessary to prove an antitrust conspiracy. Plaintiffs have clearly stated their intent to prove one overarching conspiracy rather than a "patchwork quilt" of conspiracies. *See In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 689 (N.D.Ga.1991) (citation omitted) (finding that there was "no indication that plaintiffs plan to proceed hub by hub in an effort to present evidence of *many* different conspiracies. Instead, the evidence concerning conspiracy ... reveals a 'common nucleus of operative facts' concerning the alleged antitrust violation"). The court makes no finding as to whether the evidence proffered by Plaintiffs definitively proves the alleged conspiracy. Rather, the court finds that the issues of fact and law relating to proof of Defendants' conspiracy are not only common to the proposed class, but they predominate over any individual issues.

### b. Classwide Proof of Impact

Courts have found that "[c]ommon proof of impact is possible without common damage amounts." *Potash*, 159 F.R.D. at 694 (citing *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. at 272 (finding common impact even though prices varied and were individually located)). The Third Circuit explained why product and price variations and differing geographic markets do not necessarily preclude classwide proof of impact when price-fixing is alleged:

Thus, when an antitrust violation impacts upon a class of persons who *do* have standing, there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual.... [I]f plaintiff seeks to establish payment of an illegal overcharge, the nature of proof [may not require individual proof]. If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, *though different in different regions,* was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, *notwithstanding that there would be variations among all dealers as to the extent of their damage.*

*Bogosian,* 561 F.2d at 454. *Bogosian* addresses price-fixing by sellers, but the same analysis applies to price-fixing by buyers. Plaintiffs have proffered evidence that the range of prices paid by Defendants was lower in all regions than the range that would have existed in a competitive market. *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307 (E.D.Mich.2001), (finding that "[i]f generalized evidence exists which will prove or disprove this injury element on a simultaneous class-wide basis, then there is no need to examine each class members' [sic] individual circumstance as Defendants claim. Such an examination will relate to the quantum of damages; not the fact of injury") (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129, (1969)).

Defendants argue that, because tobacco is a non-fungible product with pricing subject to a number of localized factors, Plaintiffs cannot show classwide impact. Defendants are not alone in their contention that their market is too diverse and complicated for classwide analysis. In *Catfish Litig.,* the court stated that "[t]he defendants launch a well armed defensive strategy with the aim

of convincing the court that the catfish processing industry is a highly diverse, fragmented industry which is totally incapable of price fixing, or producing any predominating result or consequence." 826 F.Supp. at 1038. Similarly, the defendants in *Domestic Air*, 137 F.R.D. at 685, "insist[ed] that differing competitive conditions and varying pricing structures at each hub and between individual city pairs mean that even if plaintiffs had some evidence of a conspiracy to fix ticket prices on one route, such evidence would not amount to common proof of a nationwide conspiracy." [12]

In *Corrugated Container*, 80 F.R.D. at 250, the court noted that the Supreme Court already had foreclosed any argument that corrugated containers were non-fungible, despite the fact that "containers vary as to dimensions, weight, color, and so on [because they are] substantially identical, no matter who produces them, when made to particular specifications." *United States v. Container Corp. of America*, 393 U.S. 333, 336, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969). The district court in *Corrugated Container* found that, though uniformity of price did not exist, proof of classwide impact was still possible. *See* 80 F.R.D. at 251. The Supreme Court in *Container Corp.* identified the difficulty in Defendants' argument regarding variations in tobacco grades and seasonal needs: when two growers' crops are viewed in light of the same "specifications"—grade and type, there is nothing unique about them. Defendants urge the court to view the variations as creating the impossible situation of comparing apples and oranges, but that argument is no different than the one rejected in *Corrugated Container*. There, the court noted that:

Generally corrugated containers are manufactured in many sizes and shapes, are frequently printed to the customer's specifications, and may have any of numerous special features such as waterproofing, ventilating holes, handholes, and so forth.... In spite of the fact that one purchaser's cardboard box may not be suitable for another purchaser's needs, when made to the same specifications the box of one manufacturer is virtually identical to that of another manufacturer.

*Corrugated Container*, 80 F.R.D. at 246. If the court were to substitute the language of the tobacco market for that of corrugated containers, the conclusion would be the same.

In *Domestic Air*, the defendants asserted a similar argument that the nature of the industry precluded proof of classwide impact, but the court likewise rejected it. The product, airline tickets, was even more varied because the case involved flights between numerous city pairs sold at different rates under different conditions. The court found credible evidence that the industry was not as "exceedingly complex" as made out by the defendants because "from any given origin to any given destination, the service offered by one defendant is not significantly different from that of another serving the same route." *Id.*, 137 F.R.D. at 685, 687.

Though Defendants have labored to show the intricacies of the market, the truth is that, for all its grade variations, the tobacco within a grade is fungible. Plaintiffs support this contention with evidence that the identity of the grower had no bearing on Defendants' purchases. Plaintiffs and their expert, Dr. Beyer (Beyer), argue that this

---

**12.** *See also In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 377 (S.D.N.Y.1996) (finding that proof of classwide impact was possible, despite the fact that the defendant offered more than 8000 distinct industrial diamond products, and individual customers negotiated a variety of discounts, rebates, credits, or special service arrangements); *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y.1996) (finding that Rule 23(b)(3) was satisfied where plaintiffs alleged antitrust conspiracy concerning thousands of sales of securities to "at least a million members"); *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d 231, 238 (E.D.N.Y.1998) (allowing certification where defendant argued that

proof of alleged conspiracy required the individual examination of defendant's interaction with approximately 1400 retailers); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 484–85 (W.D.Pa. 1999) (rejecting defendants' contention that diverse products, markets, and pricing would prevent proof of an overarching conspiracy); *In re Magnetic Audiotape Antitrust Litig.*, 2001 WL 619305, at *6, 2001 U.S. Dist. LEXIS 7303, at *20, 99 Civ. 1580 (S.D.N.Y. June 1, 2001) (finding common impact though defendants argued that there were significant differences between purchasers, and contract terms and prices varied).

similarity within grades makes the tobacco market susceptible of classwide proof in the same manner as corrugated containers and flights because it is possible to determine the percentage by which prices were artificially lowered. Beyer has been involved in roughly 20 class action price-fixing cases, including *Corrugated Container*, 80 F.R.D. 244, and *Domestic Air*, 137 F.R.D. 677.[13] Beyer studied the tobacco industry, observing auctions, interviewing participants, and reviewing Defendants' data and documents. Beyer's report included more than 125 charts and tables showing how pricing actually occurred in the market. Beyer analyzed the factors that determine whether an alleged conspiracy would have an impact on all class members and whether there is any viable formulaic approach for calculating the damages suffered. Beyer applied those factors to the tobacco market and concluded that a credible basis exists to estimate the damages, and the necessary data exist to carry out the damage methodology.

Plaintiffs' expert made several assertions in support of this conclusion. First, price is the only element at auctions (there are no negotiation or external purchase incentives involved), which means that a conspiracy to reduce prices would affect all sellers. Second, no grower has brand identity or market power to insulate it from the conspiracy. Third, tobacco is fungible in the sense that buyers of a certain grade make no distinction among growers, and a combination of grades is used in the manufacture of cigarettes. Beyer likened this case to *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, No. 1:00–CV–0447–JOF (N.D.Ga. Jan. 23, 2001), in which the court granted certification of a class of cigarette purchasers alleging a price-fixing conspiracy. The court found that the predominance requirement was satisfied, despite the involvement of numerous brands of cigarettes, each containing a blend of tobacco grades.

Beyer used Defendants' internal grades from the Tobinet database to show that any given grade sells at one or very few prices and that numerous grades are sold at a single price.[14] According to Beyer, such modest price variation is well within the range found in other class actions. He addressed Defendants' argument that sales to non-defendant buyers would not have been affected by the conspiracy by stating that the declarations and internal documents submitted under seal indicate that the few small independent dealers do not affect the market. He noted that there used to be approximately 10 leaf buyers and other manufacturers; now there are only four buyers, and Defendant Manufacturers purchase roughly 95 percent of domestic tobacco. This market concentration means that the alleged conspiracy would depress the entire market. In conclusion, Beyer asserts that the tobacco market has a basic price structure that would have been depressed in its entirety by the alleged price-fixing conspiracy.

Based on Beyer's background, experience, and the information on which he based his report, the court finds that Plaintiffs have submitted a feasible means of proving impact and damages. Defendants submitted the expert report and rebuttal report of Scheffman to refute every opinion and method used by Beyer. The court has reviewed all of the materials submitted by the parties, some of which assisted the court in its determination and some of which were not relevant to the matter of class certification. The court will not consider the merits of each party's position except to determine that Plaintiffs have shown a reasonable method of satisfying Rule 23(b)(3). *See Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 292 (2d Cir.

---

**13.** The court need not discuss the background of Defendants' expert, Dr. Scheffman (Scheffman), at this time. It is Plaintiffs' burden to show that they will introduce valid methods of proving classwide impact and damages. It is not necessary for the court to determine whether Defendants' expert has shown valid methods of proof, as well. As discussed below, the court will not choose a winner in the battle of the experts.

**14.** The Fourth Circuit in *Windham III* noted that, while the USDA used 161 grades to classify flue-cured tobacco, the buyer defendants only used 10 to 32 classifications. *See* 565 F.2d at 62–63. Scheffman's report states that the USDA currently uses 112 grades for burley tobacco and 152 grades for flue-cured tobacco. However, documents under seal indicate that at least one Defendant Manufacturer only uses approximately nine grades.

1999) (citation omitted) (stating that "[plaintiffs] need not demonstrate at this stage that they will prevail on the merits. Accordingly, this sort of 'statistical dueling' is not relevant to the certification determination"). The court therefore finds that Beyer's economic analysis supports a claim of classwide impact. *See Domestic Air*, 137 F.R.D. at 692 (stating that "plaintiffs have presented a well-qualified economic expert who, after review of the industry, has presented valid statistical methodologies for proving that each class member was, in fact, injured").

### c. Classwide Proof of Damages

In addition to proving classwide impact, Plaintiffs must show that damages are susceptible of common proof. A plaintiff in an antitrust case need only introduce evidence sufficient for a jury to estimate the amount of damages. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946); *see Catfish Litig.*, 826 F.Supp. at 1042 ("[I]t is generally recognized that some relaxation of the plaintiff's burden of proving damages is tolerated once an antitrust violation and resulting damages have been established."). Courts are willing to accept some measure of uncertainty due to the difficulty of ascertaining damages and the fact that what plaintiff's position would have been absent the antitrust violation is never known with certainty. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981). Plaintiffs do not contend that the tobacco grades make no difference to price. Rather, they argue that any variations were built into the calculation because they were already factored into the original anticompetitive pricing structure. Therefore, the variations need not be factored in again when applying the benchmark formula.

Plaintiffs contend that, under the conspiracy, all tobacco prices would have been maintained at a level below what would have existed in a competitive market. Beyer stated in his report that Defendants' actions created an artificial price range which became the range from which all grades of tobacco were purchased. Beyer contends that it is possible to determine a "benchmark" percentage by which all prices would have risen had the auctions taken place in a competitive market. Calculation of the benchmark involves two steps. First, the underpayment is determined by computing the difference between the price Defendants actually paid and the price they would have paid in a competitive market. Second, the underpayment percentage is applied to the amount sold by each class member during the conspiracy to calculate individual damages. Sales data can be obtained from the Tobinet, USDA data, and class members' records.

Beyer identified several potential benchmarks: (1) prices from direct contracts (though he cautioned that these were determined in the context of auction prices paid during the alleged conspiracy); (2) prices from a time period before the alleged conspiracy; (3) purchasing behavior of non-defendants (though Beyer cautioned that the alleged conspiracy would have affected those prices, as well); (4) prices paid for other types of tobacco not used in cigarette production; (5) an economic model that measures Defendants' and the market's demand for tobacco and then estimates the expected prices for such tobacco; (6) Defendants' purchase behavior in 1996, when Hurricane Fran reduced the anticipated supply and therefore increased competition; or (7) confidential documents containing instructions from leaf buyers reflecting a willingness to pay specified higher prices. Beyer noted that all of these benchmarks would understate the price decrease caused by the alleged conspiracy. Overstatement of damages is not, therefore, a problem.

Defendants argue that this case is no different than *Windham III* because Plaintiffs have not developed a formula that can be applied at the present time, but rather have merely presented evidence that they intend to do so. However, Plaintiffs' expert has explained in detail how a benchmark is developed and described various ways in which one could be developed that would calculate the minimum loss suffered by Plaintiffs. The benchmark cannot be further developed until the completion of merits discovery. The

court notes that similar methodology has been used in a number of antitrust cases; Beyer has not conjured up some fanciful formula that will never be applicable when the time comes. As the court in *Domestic Air* stated, Plaintiffs need not show that Beyer's methods will work with certainty at this time. *See* 137 F.R.D. at 693. Rather, Plaintiffs need only present a likely method for determining class damages. *See id.*

Defendants also argue that Plaintiffs have failed to show a workable method of proving damages related to reduced quota, sales to the cooperatives, and NNCA's.[15] Beyer stated in his report that it was possible to determine what the national quota would have been had Defendant Manufacturers submitted truthful purchase intentions, based on the anticipated testimony and internal documents. Once the national quota is determined, Beyer asserts that it .is relatively simple to calculate the damages because quota is distributed *pro rata*. He stated that average rental rates calculated by state or region could be used to calculate the damages, or quota holders could submit claim forms. Defendants argue that their purchase of tobacco from the reserves would actually increase the quota. However, that is a tenuous argument because the annual quota was based on Defendant Manufacturers' purchase intentions, and the tobacco that went into the reserve came from that quota. Hence, it appears that the quota would remain relatively static if the tobacco were purchased from the reserves; only increased purchase intentions or increased exports would raise the quota by any significant amount. A further complication is the fact that Plaintiffs' allegation that the quota should have been higher would require calculation of the succeeding years' quotas based on a calculation of the "competitive" quota.

Plaintiffs' claim for damages from lower prices on the tobacco sold to the reserves is based on the argument that tobacco would have received higher than the federal support price had Defendants competed. The second basis is that Plaintiff growers paid higher NNCA's as a result of Defendants' conspiracy to place more tobacco in the reserve. Further, Plaintiffs allege that Defendants' conspiracy determined the amount of tobacco going to the cooperatives, not the quality of the tobacco. If Defendants do not purchase the tobacco, the cooperatives must buy it at the federal support price. Plaintiffs contend there will be evidence that little or no tobacco went into the reserves in 1995 and 1996, showing that Defendants demand all types and qualities of tobacco and that no tobacco is inherently deficient.

Defendants argue that the alleged losses from sales to the cooperatives cannot be recovered because only the cooperatives have a right to assert that claim, as the cooperatives paid Plaintiffs and Defendants paid the cooperatives. However, the fact that Defendants purchased tobacco from the reserves belies the argument that the tobacco was of such poor quality that it was of no use to Defendants, though arguably it was simply not worth the support price to them. Moreover, if Defendants agreed to allocate the tobacco supply as alleged, then an agreement to allow tobacco to go to the reserves was feasible because Defendants were assured that they would not end up short on tobacco, and they would still be able to buy at discount prices. Under these allegations, Defendants used the cooperatives as a means of avoiding the federal support price. The fact that Defendants are penalized if they do not purchase at least 90 percent of their stated intentions bolsters the argument that Defendants had every intention of buying the tobacco that had been sold to the cooperatives. Whether Defendants so conspired is a question of fact properly left to a trial on the merits.

The court acknowledges that it has some reservations about Plaintiffs' claims for damages resulting from reduced quota, the NNCA's, and the tobacco sold to the reserves. Nonetheless, at this point, the court is unwilling to deny certification as to these issues. The court does, however, reserve the right to limit the class to damages sought from price-fixing at auction or to create sub-

---

**15.** With regard to Defendants' argument that Plaintiffs cannot recover under these claims for damages because they were the result of state action, the court found in its July 24, 2001, memorandum opinion that neither claim was barred.

classes. Defendants correctly contend that all causes of action must satisfy the predominance requirement of Rule 23(b)(3). In the present case, the only causes of action are for an antitrust conspiracy and abuse of market power. Even if the court denies certification as to these damages claims, it finds that the two causes of action satisfy the predominance requirement.

Defendants argue that Plaintiffs cannot prove what they allege because Plaintiffs' expert has not used proper methodology and has not fully developed the benchmark that he will use. However, the court will not referee in a battle of the experts, as it would be premature at this time. *See Flat Glass,* 191 F.R.D. at 487 (holding that "[i]n light of the conflicting expert evidence presented, and the parties' detailed arguments, we find that such arguments go to the weight of the testimony and must be resolved by the finder of fact"). The certification stage is not the proper forum for resolving the "battle of the experts." *Potash,* 159 F.R.D. at 697.

Plaintiffs contend that proof of individual damages can be done relatively easy by use of claim forms and the data from Tobinet or by appointing a special master. The difficulties posed by the damages calculation are not so enormous that they bar class certification. Individual questions of damages are typical in class actions, and they are rarely a barrier to certification. *See Catfish Litig.,* 826 F.Supp. at 1043. If Defendants' contention that the damages calculation precludes certification because it is too individualized were accepted, "there would be little if any place for the class action device in the adjudication of antitrust claims." *Id.* at 1044. *See also In re Sugar Indus. Antitrust Litig.,* 73 F.R.D. 322, 354 (E.D.Pa.1976) (stating that,

> [i]f this court were to adopt defendants' argument and deny these class actions because the computation of damages on even an individual basis destroys the 'predominance' requirement of Rule 23(b)(3), it would be tantamount to encouraging wrongdoers to commit great antitrust violations on many consumers in small amounts so as to raise the spectre of unmanageability to defeat a class action).

Further, "it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate." *Bogosian,* 561 F.2d at 456.

Though Plaintiffs may not ultimately succeed in showing what they assert, they have made a sufficient threshold showing that "what proof they offer will be sufficiently generalized in nature that even as to the impact issue the class action device will provide a tremendous savings in time and effort to the judiciary and to the parties." *Corrugated Container,* 80 F.R.D. at 252. The weight to be given to each expert's statistical and economic proof is for the trier of fact. The court's role at the class certification stage is to inquire whether or not the proposed methods of proof are "so insubstantial that they amount to no method at all." *Catfish Litig.,* 826 F.Supp. at 1042 (citing *In re Industrial Gas Antitrust Litig.,* 100 F.R.D. 280, 306 (N.D.Ill.1983)). The court finds that Plaintiffs have presented sufficient evidence of viable methodologies to clear this hurdle.

### 4. Weighing Alternative

■ The court finds that class treatment is superior to any other procedure. Difficulties in management are significant "only if they make the class action a *less* 'fair and efficient' method of adjudication than other available techniques." *In re Antibiotic Antitrust Actions,* 333 F.Supp. 278, 282 (S.D.N.Y. 1971). Though Defendants argue that the class representatives have indicated an intent to proceed individually if certification is denied, many of the class members' claims would be effectively foreclosed. Discovery expenses alone would make individual pursuit of the claims prohibitive, as demonstrated by the substantial volume of exhibits generated to this point. The treble damage provision of the Sherman Act is designed to encourage private individuals to enforce the antitrust law. *See Hawaii v. Standard Oil Co. of California,* 405 U.S. 251, 262, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). "Where the private action is not an economically feasible alternative for the victims, this deterrent effect is lost." *Corrugated Container,* 80 F.R.D. at 251. Even if individual growers and quota

holders brought suit, the burden to the courts would be enormous, and the needless duplication would be extremely expensive for all parties. The same issues would be tried multiple times involving the same facts, which would be a waste of valuable court resources and time.

The issue of manageability, which has been briefed thoroughly by both parties, is actually one of the criteria for the court to consider in deciding the superiority of a class action. Though any case of such magnitude certainly poses problems of manageability, Federal Rules of Civil Procedure 23(c) and (d) provide the court with tools to deal with them. Moreover, the Manual for Complex Litigation states that "[d]ismissal for management reasons, in view of the public interest involved in class actions, should be the exception rather than the rule." Manual, Part I § 1.43 n.72 (1977). The Manual continues with the comment that problems of administration alone ordinarily should not justify denial of class certification unless the resources required to be devoted to such administrative matters would frustrate the securing of the relief to which the class members may be entitled. *See id.* at 41–42.

Both parties in this action are well organized, with joint pleadings being filed and each side having a designated "spokesperson." Should any problems in this arena arise, the court has the power to compel their cooperation. Rule 23(d) enables the court to "determin[e] the course of proceedings or prescrib[e] measures to prevent undue repetition or complication in the presentation of evidence or argument." Fed.R.Civ.P. 23(d)(1). In addition, the court "may make appropriate orders ... dealing with similar procedural matters." Fed.R.Civ.P. 23(d)(5). The court also has the option of bifurcating the liability and damage issues at a later date or appointing special masters or magistrates to preside over individual damage proceedings. In addition, the court can decertify the class after the liability trial, if damages are kept separate.

Further, while the number of class members is in the hundreds of thousands, the difficulties attendant with calculation of damages do not make this case unmanageable.

The Fourth Circuit in *Windham III* stated that, in cases where damages were capable of mathematical calculation, "the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability." 565 F.2d at 68. Plaintiffs have offered sufficient evidence of formulaic approaches to the calculation. If the trier of fact were to deem them unworkable after a trial on the merits, that determination would foreclose the calculation process, and no time would be wasted. If, on the other hand, the trier of fact finds that Plaintiffs have presented a valid methodology, "[D]efendants should not be permitted to avoid responsibility for the magnitude of their alleged conspiracy" because it affected thousands of individuals. *Domestic Air,* 137 F.R.D. at 694.

The court finds that, though calculation of each member's damages may require submission of an individual claim form or some other individualized procedure, the administrative burden is not so great as to prevent accomplishment in a reasonable amount of time. Any class action will eventually lead to such individualized calculations, and courts have dealt with this task in a number of ways, none of which are insurmountable tasks. On the other hand, the individual plaintiffs are unlikely to pursue their claims as separate actions because the cost of doing so would be too great. Therefore, a class action is superior to any other proceeding.

## III. CONCLUSION

Admittedly, certification leads to the potential for a complicated and lengthy trial, but that is no reason to deny certification. If it were, then very few class actions would survive the certification stage. As one treatise states: "In the antitrust context, the class action as a tool for the small claimant has special importance. The antitrust laws rely heavily for their enforcement on citizen suits. Without the class action device, such laws could be violated with impunity, as long as individual damages were comparatively small, even though the aggregate damage was great." 4 Newberg & Conte, *Newberg on Class Actions,* § 18.39, at 18–137 (3d ed.1992). The Fourth Circuit in *Windham*

*III* stated that "[c]oncededly, a district court should not decline to certify a class because it fears that insurmountable problems may later appear." 565 F.2d at 70. When there is doubt about whether to certify a class in a price-fixing case, the "interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action." *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985) (citation omitted).

At present, the court does not find that insurmountable problems exist which would preclude class certification and therefore will grant Plaintiffs' motion for class certification. However, if such problems should arise, the court's determination is conditional and may be altered or amended prior to a decision on the merits. The court also recognizes its right to create subclasses and to appoint special masters at a later date to enhance manageability. In addition, the court will continue to review and monitor the manageability of this case in light of evidentiary developments throughout the progression of litigation.

IT IS ORDERED that Plaintiffs' motion for class certification [59] is granted.

